# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-00136-COA

V'NELL L. MISKELL A/K/A V'NELL MISKELL                    APPELLANT
A/K/A V'NELL LEE MISKELL

v.

STATE OF MISSISSIPPI                                                      APPELLEE

DATE OF JUDGMENT:              12/09/2016
TRIAL JUDGE:                          HON. JON MARK WEATHERS
COURT FROM WHICH APPEALED:    FORREST COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       DAVID NEIL MCCARTY
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                                     BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:            PATRICIA A. THOMAS BURCHELL
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 07/17/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE LEE, C.J., CARLTON AND WESTBROOKS, JJ.

### LEE, C.J., FOR THE COURT:

¶1. Following a jury trial in the Forrest County Circuit Court, V'Nell L. Miskell was convicted of first-degree murder and sentenced as a habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections without eligibility for parole or early release. Miskell now appeals his conviction, arguing that: (1) the trial court erred in its application of *Batson*[1] during jury selection; (2) the trial court erred by denying his request for a confession instruction; and (3) the State made improper remarks during its closing

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

argument. Finding no error, we affirm.

**FACTS**

¶2.     On September 11, 2014, Johnny Cooper's body was discovered at Timberton Park in Hattiesburg, Mississippi. His body was found submerged in water in the ditch/creek near the softball fields. An autopsy revealed he had been shot six times, and the manner of death was determined to be homicide.

¶3.     Miskell's brother, Vernell Miskell, provided a sworn statement to police that the morning after Cooper had been murdered, Miskell came to his house and admitted to Vernell he had murdered Cooper. According to Vernell's statement and trial testimony, Miskell was with Cooper smoking weed at the park the evening before the body was discovered. While Cooper, a known drug dealer, was counting his money, Miskell shot him once. Cooper ran and Miskell continued to shoot him until he fell into the ditch, where Miskell shot him again. Vernell also testified at trial that he found in Miskell's clothes a nine-millimeter firearm and later sold it. Later, while in jail on an aggravated-assault charge, Vernell wrote another statement which stated that Miskell had not told Vernell anything regarding Cooper. At trial, Vernell admitted he wrote the latter statement at Miskell's request, because he did not want to get his brother in trouble. He further admitted that his initial statement was true.

¶4.     Jeff Byrd, a crime-scene investigator with the Metro Crime Scene Unit, testified at trial that he was called to collect evidence at the scene where Cooper's body was found. Investigator Byrd testified that he observed blood around the edges of the creek and other spots of blood he believed to be the path Cooper traveled as he was bleeding. He also

2

recovered several nine-millimeter shell casings in a pathway leading to a nine-millimeter bullet that he found near the edge of the creek. Photographs of the scene and evidence were shown to the jury. Cooper's car was found nearby at Kamper Park. Investigator Byrd attempted to collect DNA and fingerprints from the car, but he was unable to do so due to dew or rain from the night before and an unidentified sticky substance that prevented any fingerprint collection. Investigator Byrd also swabbed the car's steering wheel, but testified he was unaware of any DNA evidence connecting Miskell to the crime.

¶5.     Cooper's sister, Patience Williams, also testified. Williams stated that on the day Cooper's body was found, she read online that the body of a young man had been found in the park. She became concerned when she attempted to call Cooper several times, but he never answered or returned her call. Williams called her mother, Theresa Cooper, and asked her if she had seen or heard from Cooper. Theresa answered that she had not heard from Cooper and that he may have stayed with his girlfriend the night before. Williams called Cooper's girlfriend, but she had not seen or heard from Cooper either. Worried that Cooper was arrested or something else was wrong, Williams went to the police station to check. Williams inquired about Cooper at the police station, but the police did not reveal anything to her. Williams testified that the officers asked her a lot of questions and told her to hang around, to which she became alarmed that something was wrong and they were not telling her, so she called her mother, Theresa, to come to the station.

¶6.     While Williams was at the police station, she saw Miskell and his brother, Pedro Alvarez. At that time, she did not know the identity of the body that was found in the park.

3

When Theresa arrived at the police station, she saw Alvarez but did not see Miskell. Theresa testified that Alvarez came up to her, hugged her neck, and said "I'm so sorry for your loss." At this point, the police still had not informed Theresa or Williams of the identity of the body found, and Theresa testified that at no point while she was at the police station did the officers inform her of the identity of the body.

¶7.   Neal Rockhold, a detective with the Hattiesburg Police Department, also testified. Detective Rockhold stated that on the day Cooper's body was discovered, Alvarez came to the police station and indicated he believed his friend, Cooper, had been killed. At some point later, Cooper's girlfriend provided the police with a photograph of Cooper, and the body was identified to be Cooper. Detective Rockhold then interviewed Alvarez who stated that he and Miskell had been with Cooper the day before the body was found. When Detective Rockhold indicated he wanted to interview Miskell also, Alvarez attempted to reach him on the phone to come in. Alvarez then stated he would be able to get Miskell to come talk to the police if they would release him. The police released Alvarez, but Miskell did not come in for questioning that day. After attempting to contact Alvarez several times, he gave multiple excuses as to why he could not come back for continued questioning.

¶8.   Detective Rockhold used Cooper's cell-phone records to determine who had made calls to him. From those records, Detective Rockhold determined that Jeremy Waters was the last person to speak to Cooper on the phone prior to his death. Waters gave a statement to the police the day after Cooper was murdered. He also testified at trial. Waters stated that on September 10, 2014, he met Cooper at Timberton Park around 10:00 p.m. to buy some

4

weed. Waters parked between Cooper's BMW and a silver or white Ford SUV that he did not recognize.[2] When Waters arrived at the park, he saw Cooper smoking with some friends in the dugout area. Waters did not know who Cooper's friends were. After Waters purchased the weed, he left and went to his grandmother's house, which was a block or two from the park. Waters sat in his car for about ten minutes and then he heard five or six gunshots. He ran inside to tell his grandmother, but he did not call the police.

¶9. On September 12, 2014, Detectives Jeremy Dunaway and Brandon McLemore were able to interview Miskell. Both detectives testified at trial. Detective Dunaway testified that he advised Miskell of his *Miranda*[3] rights, but Miskell waived them. During the portion of the interview conducted by Detective Dunaway, Miskell initially denied that he knew Cooper. Eventually, however, Miskell admitted that he knew Cooper and had met him through his brother, but did not indicate which brother—Alvarez or Vernell. On the evening before Cooper's body was found, Miskell stated he was with Alvarez and Vernell at Shoemaker Apartments, and while they were there, Cooper showed up because they were all supposed to smoke together. According to Miskell, Cooper left to make a stop before they were supposed to meet up again. Miskell stated he went with Vernell to Tony Drive where Alvarez had an apartment, but Cooper never showed up. Detective Dunaway testified that Tony Drive was across the street from where Cooper's body was found. Miskell stated that he left Alvarez's apartment on Tony Drive, went back to Shoemaker apartments, and then

___

[2] Later during the investigation, a cell phone belonging to Miskell was found in a silver Ford Expedition that was parked outside the police station.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

5

to Broadway Inn where he had a room. Miskell told Detective Dunaway he arrived back at his hotel room at 10:00 p.m.

¶10. Detective McLemore also testified regarding his portion of the interview with Miskell. During the interview, Miskell initially denied he had been in the area near the park where Cooper's body was found. However, later in the interview he admitted that he and his brother Alvarez had been at the park and in the dugout where the bullet casings were recovered. Miskell used a map to explain where he was in the park and signed the map. He also admitted that he was at the park with Cooper when Waters came to buy weed. Miskell did not admit to shooting Cooper.

¶11. The State rested, and the defense did not put on any witnesses. The jury found Miskell guilty of first-degree murder, and he was sentenced as a habitual offender to life imprisonment without the possibility of parole. Miskell now appeals his conviction.

## DISCUSSION

### I. Jury Selection

¶12. Miskell argues that the trial court failed to correctly follow *Batson*, 476 U.S. at 89, when Miskell challenged the State's use of five out of its six peremptory strikes on African-American jurors. Specifically, Miskell argues that the trial court collapsed the first two *Batson* steps; ruled that only a "pattern" of discrimination mattered; and failed to rule on striking one of the jurors. Miskell further argues that these errors require reversal and remand for a new trial because Miskell was denied a jury of his peers. We do not agree.

¶13. "The trial judge acts as finder of fact when a *Batson* issue arises." *Allen v. State*, 235

6

So. 3d 168, 171 (¶7) (Miss. Ct. App. 2017). "We will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence." *Id.*

¶14. The use of peremptory strikes "is subject to the commands of the Equal Protection Clause[,]" which "prohibits using peremptory strikes to engage in racial discrimination." *H.A.S. Elec. Contractors Inc. v. Hemphill Const. Co.*, 232 So. 3d 117, 122-23 (¶13) (Miss. 2016) (citing *Batson*, 476 U.S. at 89). "To safeguard against racial discrimination in jury selection, the United States Supreme Court in *Batson* established a three-step process." *Id.* at 123 (¶14).

> First, the party objecting to the use of a peremptory strike has the burden to make a prima facie case that race was the criterion for the strike. Second, if the objecting party makes such a showing, the burden shifts to the striking party to state a race-neutral reason for the strike. Third, after the striking party offers its race-neutral explanation, the court must determine if the objecting party met its burden to prove purposeful discrimination in the exercise of the peremptory strike—that the stated reason for the strike was merely a pretext for discrimination.

*Id.* (footnote omitted).

### A. Step 1

¶15. The records shows that when Miskell's counsel objected to the State's use of five peremptory strikes on African-American jurors, the trial court first noted there were four African-American jurors already empaneled. The trial court then stated, "Let me have your reasons. I don't think he's made out a prima fa[cie] case, but just out of an abundance of caution."

¶16. [W]here the trial court does not explicitly rule on whether the defendant

7

established a prima facie case under *Batson* but nevertheless requires the State to provide gender/race-neutral reasons for its challenges and the State provides reasons for its [strikes], the issue of whether the challenging party established a prima facie case is moot.

*Payne v. State*, 207 So. 3d 1282, 1285 (¶9) (Miss. Ct. App. 2016) (citing *Lynch v. State*, 877 So. 2d 1254, 1271 (¶48) (Miss. 2004)). Here, the trial court did not find Miskell had made a prima facie case that race was the reason for the strikes. Nevertheless, the trial court still required the State to articulate race-neutral reasons for the strikes. As such, "the issue of whether [the challenging party] met its burden to establish a prima facie case is moot. We begin our review with step two." *H.A.S. Elec. Contractors*, 232 So. 3d at 123 (¶17).

## B. Step 2

¶17. Under step two of *Batson*, the State was required to provide its race-neutral reasons for the strikes. "Unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race neutral." *Id*. at 133 (¶9). "This process does not demand an explanation that is persuasive, or even plausible—any reason [that] is not facially violative of equal protection will suffice." *Id*. (internal quotation mark omitted).

¶18. "[O]nce the striking party offers a valid race-neutral reason, the trial judge must allow the strike unless the other party demonstrates that the valid race-neutral reason was a pretext for discrimination." *Id*. at 124 (¶19). "[W]hen the objecting party offers no rebuttal, the court is forced to examine only the reasons given by the striking party." *Id*. at 125 (¶24). At this point, "the court must determine if the objecting party met its burden to prove purposeful discrimination in the exercise of the peremptory strike—that the stated reason for the strike was merely a pretext for discrimination" *Id*. at 123 (¶14).

8

¶19.    Miskell challenged the State's striking of Jurors 2, 7, 9, 12, and 18. We examine each strike in turn.

### 1.    Juror 2

¶20.    The State's reasons for striking potential Juror 2 were that "she had no eye contact"; "she looked down a lot"; "she seemed tired"; "she seemed disinterested"; and that "her form was incomplete." Miskell's counsel responded with various reasons as to why the juror form was incomplete but offered nothing in response to the State's reasons for fatigue or inattentiveness. The trial court then found that "[the State] has stated a race[-]neutral reasoning for exercising the strike." On appeal, Miskell argues that the trial court failed to rule on its challenge of this strike. However, it is clear from the record that the trial court accepted the State's reason as race-neutral, allowing the strike to stand. Further, at the end of the *Batson* hearing, after examining all the reasons for each challenged strike, the trial court stated it believed the State's reasons were race-neutral and did not find a "discriminatory purpose on the exercise of *any* of these challenges." (Emphasis added). We find no error in the trial court's acceptance of the stated race-neutral reason.

### 2.    Juror 7

¶21.    The State explained that it chose to strike potential Juror 7 because "she wasn't paying attention. She looked down dramatic a lot. A lot of times we looked at her, it was like she was nodding asleep." Miskell's counsel responded, "I think she'd make a good juror." This response does not constitute a rebuttal that the reason given was pretext for discrimination. The trial court then found the State's reasons were "acceptable reasons for striking a juror."

9

Miskell's counsel failed to rebut and we find no error in the trial court's acceptance of the State's reason to strike Juror 7; as such, no further examination for pretext was required. *See H.A.S. Elec. Contractors*, 232 So. 3d at 125 (¶¶24-25). Therefore, we do not disturb the trial court's finding that the strike of Juror 7 was nondiscriminatory.

### 3. Juror 9

¶22. The State informed the trial court that it chose to strike potential Juror 9 because the juror form was incomplete regarding whether he had sat on a criminal jury; the form was not signed; "he had an angry look on his face"; and "didn't look like he wanted to be here." Miskell's counsel offered no rebuttal and agreed that the juror's form was incomplete. The trial court found that the State "had race[-]neutral reasons for striking [Juror 9]" and "conclude[d] that the exercise of a challenge by [the State] [wa]s appropriate[.]" We find no error in the trial court's determination that the strike was nondiscriminatory.

### 4. Juror 12

¶23. The State's articulated reasons for striking Juror 12 included "that he looked down a lot"; "looked in the other direction" when the prosecutor "[a]ttempted to make eye contact with him"; "was unattentive"; "seemed tired"; and failed to respond to questions asked of him. Miskell's counsel stated that he did not notice Juror 12 looking tired, but offered no rebuttal. The trial judge found "those [we]re acceptable race[-]neutral reasons for exercising [the] [peremptory] challenge, and [he did] not find that the strike was -- [he did] not believe that the strike of [Juror 12] was based on his race but rather on other acceptable factors." We find no error.

10

### 5. Juror 18

¶24. The State explained that it chose to strike Juror 18 because "she was extremely tired"; "did not respond to questions of whether she was tired"; "looked down a lot"; and she was seen "nodding and sleeping a few times." Miskell's counsel replied, "I have no response, Your Honor." The trial court found that the State's explanations for the strike were race neutral. We find no error in the trial court's acceptance of the State's race-neutral reason, thereby allowing the strike to stand.

¶25. We have already addressed Miskell's arguments that the trial court collapsed the first two steps of *Batson* and that the trial court failed to rule on the challenge to strike Juror 2. Additionally, Miskell argues that the trial court "stated that only a pattern of racial discrimination violated *Batson*, and failed to look at the individual strikes." We reject this argument. A review of the transcript does show that the trial court stated it saw "no pattern of strikes based on race." The transcript also reveals that at no point, however, did the trial court require a showing of a "pattern of racial discrimination" as Miskell contends. And, as is evident by the foregoing discussion, the trial court did not fail to look at the individual strikes, but rather, required the State to articulate its reasons for the striking of each juror. It is further clear that the trial court accepted the State's reasons as valid race-neutral reasons and determined there was no "discriminatory purpose on the exercise of any of these challenges." We find no error in the trial court's findings. This issue is without merit.

### II. Jury Instructions

¶26. Miskell claims the trial court erred when it denied his proposed jury instruction

regarding his statement to the police. Miskell's proposed jury instruction, D-13, read as follows: "The Court instructs the jury that if you believe from the evidence that the alleged confession of the defendant was untrue you should disregard it." The trial court denied the instruction, finding that it was cumulative of other instructions, and that it was not a proper statement of law.

¶27. "This Court reviews the grant or denial of jury instructions for an abuse of discretion." *Windless v. State*, 185 So. 3d 956, 960 (¶8) (Miss. 2015). "When jury instructions are challenged on appeal, we do not review them in isolation; rather, we read them as a whole to determine if the jury was properly instructed." *Id*. (internal quotation marks omitted). "If the jury instructions, read as a whole, fairly announce the law of the case and create no injustice, no reversible error will be found." *Id*.

¶28. Miskell argues that the trial court's refusal of D-13 deprived him the opportunity to attack the truthfulness of his statement and deprived the jury of its duty to determine the weight and credibility of the statement. He also asserts that the trial court's ruling regarding the admissibility of the statement amounted to a peremptory instruction that the jury must find the statement true. The record does not support Miskell's arguments.

¶29. First, the trial court's admission of Miskell's statement did not amount to a peremptory instruction that the statement must be accepted by the jury as true. It is well-settled that "[t]he voluntariness and admissibility of a confession is to be decided by the trial court judge as a matter of law, while the weight and credibility to be given to a confession is within the sole province of the jury." *Mayes v. State*, 925 So. 2d 130, 133 (¶7) (Miss. Ct.

12

App. 2005). The trial court, in the presence of the jury, stated the following: "I find that Mr. Miskell's interview or confession was intelligently, knowingly, voluntarily made having understood and waived his *Miranda* rights and that the interview or the confession is not the product of promises, threats or inducements." The trial court then allowed the transcript of Miskell's interview with the police into evidence. This was an evidentiary ruling made during the course of the State's case-in-chief. In its instructions to the jury, the trial court stated the following regarding the admissibility of evidence:

> The production of evidence in court is governed by rules of law. From time to time during the trial it has been my duty as judge to rule on the admissibility of evidence. You must not concern yourselves with the reasons for my rulings since they are controlled and governed by the rules of law. You should not infer from my rulings on these motions or objections to the evidence that I have any opinion on the merits favoring one side or the other.

¶30. Thus, it is clear that the court's admissibility ruling regarding Miskell's statement was not a peremptory instruction as to its truthfulness or acceptability, and the jury was further instructed regarding such evidentiary rulings.

¶31. Second, Miskell was not, as he contends, deprived of the opportunity to attack the truthfulness of his statement based on the trial court's refusal of D-13. Our law is clear that "[o]nce a confession is admitted into evidence, a defendant is entitled to submit evidence and have the jury pass upon the factual issues of its truth and voluntariness and upon its weight and credibility." *Allen v. State*, 212 So. 3d 98, 104 (¶13) (Miss. Ct. App. 2016) (quoting *Wilson v. State*, 451 So. 2d 724, 726 (Miss. 1984)). "The defendant may offer proof to show that the confession is untrue and explain why he made the untrue statement." *Id*. "Once this rebuttal or impeachment testimony is offered, then the jury may conclude that the confession,

13

though found by the court to be voluntary, is untrue and not entitled to any weight." *Id*. Thus, Miskell was entitled to submit evidence regarding his confession as to any factual issues of its truth, its voluntariness, and its weight and credibility. He did not do so. As such, Miskell's argument that he was deprived the opportunity to attack the truthfulness of his statement is misplaced.

¶32.   "'[W]hile the weight and credibility to be given to a confession is within the sole province of the jury[,]' . . . there is no requirement that a trial court grant a separate instruction on the weight and credibility to be given to a confession." *Mayes*, 925 So. 2d at 133 (¶7) (citing *Scott v. State*, 878 So. 2d 933, 968 (¶96) (Miss. 2004)). Again, on appeal, "this Court considers the jury instructions given as a whole." *Dora v. State*, 20 So. 3d 46, 50 (¶16) (Miss. Ct. App. 2009). "The trial court may refuse to grant jury instructions that incorrectly state the law, are covered fairly elsewhere in the instructions, or are without foundation in the evidence." *Id*.

¶33.   Upon our review of the instructions as a whole, we find no abuse of discretion by the trial court in refusing D-13. The records shows that the jurors were instructed that it was their "exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose," and that they were "the sole judges of the weight and credit to be assigned the testimony and supporting evidence of each witness who has testified in this case." Thus, the jury was properly instructed regarding its duty to judge the weight and credibility of the evidence presented and witness testimony, which certainly included Miskell's statement to police and Detectives McLemore's and Dunaway's testimony

14

regarding their interview with Miskell. Therefore, the jury instructions given accurately stated the law and fairly covered the instructions proposed in D-13. This issue is without merit.

### III. Closing Argument

¶34. In his final issue on appeal, Miskell argues that the State committed prosecutorial misconduct by making improper remarks during its closing argument. As such, Miskell argues he is entitled to a new trial.

¶35. Attorneys are generally afforded wide latitude in closing arguments. *Moffett v. State*, 156 So. 3d 835, 857 (¶61) (Miss. 2014). Any alleged improper prosecutorial comments must be considered in the context of the circumstances of the case. *Id.* at 867 (¶95). "The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Id.* at 857 (¶60).

¶36. Miskell specifically complains that during closing argument, the State made five different improper arguments that individually and cumulatively prejudiced him.

### A. Miskell's Decision Not to Testify

¶37. Miskell first alleges that the prosecutor unlawfully commented on his decision not to testify. Miskell argues that these violations occurred while the State argued that the first element of the crime—the date and location of the victim's death, was "an undisputed fact. The defense doesn't disagree with this. They haven't put on any evidence to the contrary."

15

Miskell's counsel objected to the comment arguing that Miskell was not bound to put on any evidence, and the trial court responded that it had already instructed the jury regarding that issue.

¶38. "While a direct reference to the defendant's failure to testify is 'strictly prohibited,' all other statements must be looked at on a case-by-case basis." *Young v. State*, 236 So. 3d 49, 59-60 (¶58) (Miss. 2017). "There is a difference between a comment on the defendant's failure to testify and a comment on the failure to put on a successful defense." *Id*. at 60 (¶58). "The State is entitled to comment on the lack of any defense, and such a comment will not be construed as an insinuated reference to a defendant's failure to testify." *Id*.

¶39. Here, the prosecutor made no direct reference to Miskell's decision not to testify, and upon our review of the allegedly improper comments, we do not find the comments are an insinuated reference to such. Rather, the State's comments were fair arguments based on the testimony and evidence presented at trial. Furthermore, the record reflects that during opening statements, Miskell's counsel stated, "We don't dispute that Johnny Cooper was murdered," and "another fact that's not disputed in this case is that Johnny Cooper was at Timberton ballpark on September 10th or September 11th, the evening of September 10th, 2014, selling drugs." The prosecutor's comments were in direct reference to the first element the State had to prove regarding the location and date of the crime charged, and therefore, they were proper arguments before the jury. Thus, having reviewed the comments in the context of the circumstances of the case, we do not find these comments were improper.

¶40. Miskell next argues that the State made an impermissible "send-a-message" argument,

16

erroneously invoked the "Golden Rule," and made an improper "accountability" argument.

Miskell's allegation of these errors all refer to the following statements made during the

prosecutor's closing argument:

> In their world a gun is a tool. In their world a gun is a tool. Let me be clear one more time. In their world a gun is just a tool; like a screw driver. It's not like us. We take a gun, and it's ours, and we give it to a friend, but it's ours to take responsibility. In their world, just like he said, a gun is a tool.
>
> . . . .
>
> It's used, and it's passed along. It's discarded. Why he didn't think anything of his little brother coming to confess to him. What did he reveal to him? He didn't think anything of it. When we circle the wagons and the mom and girlfriend was charged for hiding the weapon, he had no other choices down there. Let me be clear. The weapon is just a tool to them, in the world they live in. To them it's not a big deal. It's meaningless. The fact that that guy is dead, it's meaningless. That park across from the university didn't mean anything. Find the gun. Go and sell it for $150. Didn't mean anything. Going to the police department and not telling the truth, didn't mean anything. Let me be clear one last time. It didn't mean anything to them. It was just a tool to be destroyed, when it's done with. It means something to me. It means something to him, to her, to her and to her. It means something to them, and I'm going to ask you to make it mean something to you. You don't do this. You don't do that. It's not allowed. It's illegal, and there's accountability here in Hattiesburg. We're nowhere else. We will always be for accountability. They were always be for accountability.

¶41. Miskell's counsel objected stating, "The verdict must be based on the evidence and

not emotion." The trial court encouraged the Stated to move on, but overruled the objection.

### B. Send-a-Message Argument

¶42. Miskell now argues that the State's comments that Hattiesburg was like "nowhere

else" constituted an improper send-a-message argument.

¶43. "Our supreme court has repeatedly condemned the 'send a message' argument and

17

warned prosecutors accordingly." *Bryant v. State*, 232 So. 3d 174, 183 (¶24) (Miss. Ct. App. 2017) (internal quotation mark omitted). "Two threshold questions are used to determine whether a send-a-message argument constitutes reversible error." *Jackson v. State*, 174 So. 3d 232, 238 (¶17) (Miss. 2015). "This Court first looks at whether the argument is procedurally barred because defense counsel failed to object to the statement at trial." *Id*. "However, even in the absence of a contemporaneous objection, we will review on appeal a claim that a prosecutor made an improper send-a-message argument if the argument is so inflammatory that the trial judge should have objected on his own motion." *Id*. (internal quotation marks omitted). "Second, this Court considers whether the defense counsel provoked the prosecution to make the challenged statement." *Id*. "After considering the two threshold questions, the Court then must determine (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused's rights." *Id*. (internal quotation mark omitted).

¶44. Here, Miskell's counsel objected to the comments, and our review of the record does not reveal that the alleged improper comments were provoked by Miskell's defense counsel. So, we must first determine "whether the remarks were improper." *Id*. Here, whether the State's singular comment that Hattiesburg was "nowhere else," constituted a send-a-message argument is, as stated in *O'Connor v. State*, 120 So. 3d 390, 399 (¶22) (Miss. 2013), "dubitable at best." Nevertheless, assuming the comment was improper, we must determine "whether the remark prejudicially affected the accused's rights." *Jackson*, 174 So. 3d at 238 (¶17). Under this second prong, "it must be clear beyond a reasonable doubt that, absent the

18

prosecutor's inappropriate comments, the jury would have found the defendant guilty."

*Brown v. State*, 986 So. 2d 270, 276 (¶16) (Miss. 2008) (emphasis omitted). "This, of course,

amounts to a harmless-error analysis, and is the analysis to be used for the second prong

. . . ." *Id.* In this case, having considered the evidence and testimony presented at trial and

the context in which the alleged improper comments were made, it is clear beyond a

reasonable doubt that, absent the prosecutor's comment that Hattiesburg is "nowhere else,"

the jury would have found Miskell guilty. Therefore, we find that any error was harmless.

### C.    Golden-Rule Argument

¶45.    Miskell also argues that the State's comments, "make it mean something to you,"

constituted an impermissible "Golden Rule" argument. "'Golden rule' arguments, which ask

the jury to put themselves in the place of one of the parties, are prohibited." *Batiste v. State*,

121 So. 3d 808, 863 (¶145) (Miss. 2013). The Court has explained:

> It is the essence of our system of courts and laws that every party is entitled to
> a fair and impartial jury. It is a fundamental tenet of our system that a man
> may not judge his own case, for experience teaches that men are usually not
> impartial and fair when self interest is involved. Therefore, it is improper to
> permit an attorney to tell the jury to put themselves in the shoes of one of the
> parties or to apply the golden rule. Attorneys should not tell a jury, in effect,
> that the law authorizes it to depart from neutrality and to make its
> determination from the point of view of bias or personal interest.

*Id*. (quoting *Chisolm v. State*, 529 So. 2d 635, 639-40 (Miss. 1988)). Additionally, an error

may be harmless where an improper argument was "sufficiently insignificant in the overall

context of the case." *Id*.

¶46.    Upon our review of the transcript, we do not find that the prosecutor's comment

"make it mean something to you" asked the jurors to put themselves in the place of the

19

victim, thereby violating the prohibition against the "Golden Rule" comments. A review of the context in which the comments were made demonstrates that the prosecutor appealed to the jury to make the *evidence* "mean something"—referring to the sold gun, dead body, location of the body, and statements given to police. As such, the comments do not constitute an improper golden-rule argument.

### D. Accountability Argument

¶47. Miskell also argues that his rights to a fair trial were violated because of the State's comments regarding accountability: "there's accountability here in Hattiesburg. We're nowhere else. We will always be for accountability. They were always be for accountability." Miskell argues that the comments "created an extra-legal burden of accountability which was prejudicial."

¶48. For support, Miskell cites *Sheppard v. State*, 777 So. 2d 659 (Miss. 2000), in which the supreme court found the prosecutor's comments constituted reversible error. In S*heppard*, "the prosecutor stated that if the jury voted to acquit, he wanted them to call him and explain their rationale of finding the defense witnesses credible, so he could explain it to the victim's family." *Id*. at 661 (¶6). The supreme court found this was reversible error because it "suggest[ed] to the jury that it would be accountable to the prosecution and the victim's family for its decision" thereby creating "an extra-legal burden of accountability to the State prejudicial to the rights of the accused." *Id*. at 661-62 (¶¶9-10). That is not the case here. As such, Miskell's reliance on *Sheppard* is misplaced. Here, the prosecutor's comments regarding accountability did not suggest to the jurors they were accountable to the

20

State or to the victim's family, and did not impose an "extra-legal burden of accountability."

¶49. The inquiry remains "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Moffett*, 156 So. 3d at 857 (¶60). Again, "[a]ny alleged improper prosecutorial comments should be considered in the context of the circumstances of the case. *Id.* at 867 (¶95). Here, we do not find that the comments complained of constituted an improper accountability-argument as found in *Sheppard* and the comments did not have a natural and probable effect to create unjust prejudice against Miskell. This issue is without merit.

### E. Facts Not in Evidence

¶50. Miskell argues that the State, in its closing argument, "repeatedly strayed outside the evidence presented at trial." However, our review of the record reveals the prosecutor made two comments regarding facts not in evidence, to which Miskell timely objected, and the objection was sustained. Our supreme court has held "where an objection is sustained, and no request is made that the jury be told to disregard the objectionable matter, there is no error." *Ford v. State*, 975 So. 2d 859, 868 (¶33) (Miss. 2008). Because Miskell did not ask the judge to admonish the jury, he is barred from arguing any error in regard to this on appeal.

### CONCLUSION

¶51. For the foregoing reasons, we find Miskell received a fair trial and that no reversible error occurred. Accordingly, we affirm his conviction and sentence.

21

¶52.   **AFFIRMED.**

      **IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, GREENLEE AND TINDELL, JJ., CONCUR.  WILSON AND WESTBROOKS, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**