# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00100-COA

**CHARLES WILLIAMS A/K/A CHARLES**                  **APPELLANT**
**CORDELL WILLIAMS A/K/A BLINK**

**v.**

**STATE OF MISSISSIPPI**                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/17/2021 |
| TRIAL JUDGE: | HON. MICHAEL PAUL MILLS JR. |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA RODU ROSENBLATT |
| DISTRICT ATTORNEY: | JOHN DAVID WEDDLE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/31/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Charles Cordell Williams appeals his conviction for armed robbery and the Alcorn County Circuit Court's sentence of twenty-five years to be served day for day in the custody of the Mississippi Department of Corrections. On appeal, Williams raises a single issue: ineffective assistance of counsel. Having considered the record before us and the arguments of counsel, we affirm Williams's conviction and sentence.

## Facts and Procedural History

¶2. Around 5:00 p.m. on July 14, 2020, three masked men robbed Culver's Grocery in Corinth, Mississippi. Williams was charged with armed robbery for his involvement.

¶3.    During a jury trial held on November 9-10, 2021, the State's witnesses included Elizabeth White, the sole employee at the store on that day; Mackie Sexton, the deputy sheriff who initiated pursuit of the robbers; officers who participated in the pursuit or the investigation of the robbery, including Alcorn County Deputy Sheriff Shane Latch and Corinth Police Department Detectives Jerry Rogers and Heather Russell; and store owner Lisa Culver who verified the surveillance footage that was presented to the jury.

¶4.    White testified that three masked men came into the store as she was restocking drinks into a cooler.  The tall, lanky man who stood by the door asked, "Where's it at?"  She assumed he meant the money bag, but as she moved toward the counter, the man pointed a "big silver gun" at her, so she stopped.  Another man wearing a white t-shirt ran behind the counter and grabbed the store's money bag and White's purse off the shelf.  The third man was inside the store, looking out the window.  He saw a sheriff's car enter the parking lot and warned the others.  Although all men had worn masks, White later identified Williams as the man who went behind the counter and grabbed the money bag.  As Williams ran past her, White was able to grab her purse from him.  Then Williams and the man with the gun fled in a getaway car, and the third man ran around the back of the store by a dumpster.  She ran outside and saw Deputy Sheriff Mackie Sexton who had driven up.  Sexton took off after the men, and White called 911 to report the robbery.  At trial, the State entered into evidence the store's surveillance videos that had recorded the robbery and a recording of White's 911 call.  On cross-examination, White testified that the robbery itself lasted only twenty-one seconds.  But even though Williams was wearing a mask, she was adamant that she could identify him

2

as the man who took the money bag. She also testified that she had never seen him before the robbery.

¶5.     Deputy Sexton testified that he had driven up to Culver's Grocery to grab a quick snack. He noticed a car at the end of the building and a man standing there with something wrapped around his head. As he pulled beside the car, the man ran to the store's entrance, stuck his head inside, and two other men ran out with the cashier behind them, pointing. Because the cashier was there, Sexton did not confront the men but followed their vehicle as it headed toward Highway 72. While in pursuit, Sexton saw a baseball cap being thrown out the window from the passenger side. The empty money bag was also thrown from the vehicle and later retrieved by law enforcement.

¶6.     Sexton continued testifying that Alcorn County Deputy Sheriff Shane Latch joined the pursuit, which exceeded 100 miles per hour. The vehicles passed through Tippah County, Mississippi, and into Marshall County, Tennessee. There, Marshall County deputies used "stop sticks"[1] to blow out the tires of the vehicle being pursued. It went off the road, down an embankment, and into a cornfield where the men in the car exited and ran off. Deputy Jerry Mayhall testified that he arrived at the cornfield about ten minutes later. He searched the vehicle and found Williams's driver's license[2] in the front passenger area of the vehicle. Mayhall also found the vehicle's registration and determined that the owner of the

---

[1] Deputies stretched coiled wires with spikes across the road. When the pursued vehicle crossed over them, the spikes blew the tires out.

[2] Mayhall actually found Williams's Mississippi identification card, not his driver's license.

3

vehicle was Williams's fiancée, Kishtaya Smith.

¶7.     Law enforcement officers from various agencies established a perimeter and used drones, a helicopter, and K-9 dogs to scour the field.  One of the men, David Brown, was found with $2,113 in his possession.  Photographs of the money were entered into evidence.  Later that night, through the use of thermal imaging on the helicopter, law enforcement found Williams shirtless but with a white t-shirt nearby.  He was arrested and booked at the jail in Fayette County, Tennessee, and later transported to the jail in Alcorn County, Mississippi.

¶8.     Meanwhile, back at Culver's Grocery, investigators found a purple and black SCCY 9mm handgun in a dumpster.  A detective named Jerry Rogers was on his way in response to the radio dispatch of the robbery, when he encountered Andrew Walker, a black male who fit the description of one of the robbers, walking down the road.  Rogers arrested him, and the handgun found in the dumpster was later traced to Walker.  Rogers joined Detective Heather Russell, who headed the investigation at the scene, and they viewed the videos from the store's surveillance cameras.  Rogers also heard over the radio that a white bag had been thrown from the vehicle during the pursuit.  Rogers went to the identified location and retrieved the stolen white "Regions" bank bag with the name "Darnell" written on it.

¶9.     Lisa Culver, the owner of the grocery store, testified about additional surveillance footage from Culver's Grocery, showing that several hours before the robbery, Williams entered the store wearing a face mask with a Chicago Cubs logo on it, a white t-shirt, blue jeans, and red athletic shoes.  He purchased two canned Sprite drinks.  Detective Russell also testified that the items taken from Williams when he was booked included jeans and red

4

tennis shoes.

¶10.    The getaway vehicle was towed and searched pursuant to a search warrant. Law enforcement found a Taurus 9mm handgun under the front passenger seat, a blue Chicago Cubs face mask, a red T-shirt, a black skull cap, a pair of black pants, two Sprite cans, and Williams's debit card in the console.

¶11.    The State questioned Detective Russell extensively about the individual suspects, the clothing they wore, and DNA testing that was done. She was then asked, without objection by the defense, what her investigation revealed about who committed the crime. She answered that Brown stood at the door, Walker was the lookout, and Williams grabbed the bag behind the counter. On cross-examination, Williams's defense counsel asked what evidence she had obtained from her interrogation of Andrew Walker. She answered that Walker told her that Williams was in the vehicle with him and Brown and that he heard Williams say they were going to "hit a lick," which meant to rob someone. Defense counsel went on to establish that Walker previously had twice lied to Russell when he said he had gone jogging that morning and that he had nothing to do with the robbery. Defense counsel also questioned Russell at length about items that were and were not sent for DNA testing and the reasons why. The two white t-shirts and the black pants found were not sent for DNA testing; the red t-shirt was sent, and the results excluded Williams but matched Brown. In addition, the defense established that Williams's identification card was in the property bag that Fayette County deputies sent after they arrested Williams. Presumably the card was taken from him at the time of the arrest.

¶12.   After the circuit court advised Williams that he had the right to remain silent, Williams chose to testify.  Williams said that he and Smith were living together in Memphis on the day in question.  He had taken her to work, and after returning home, his cousin David Brown offered him $40 to take him to Corinth so that Brown could get his COVID-19 stimulus money from Brown's "baby mama."  Walker was with Brown.  Williams agreed, put $20 worth of gas in Smith's car, and pocketed the other $20.  Williams said he had never been to Corinth and took directions from Walker.  They stopped at Culver's Grocery where Williams bought two Sprites, some cigarettes, and a pack of cigars.

¶13.   There was no one home at the place where Brown went to pick up his stimulus money.  They then went to a friend of Brown's where Brown bought some marijuana.  Brown's unnamed friend joined them, and they went to a barber shop where they hung out for a while.  They continued to drive around Corinth when Smith called and told Williams that she would be off work soon.  Williams told the others that he had to get back to Memphis, and Brown called his lady friend and asked her where she was.

¶14.   The four men stopped again at Culver's Grocery, where Williams said he let the others out while he waited in the car, rolling a joint.  The next thing he knew, Brown jumped back into the car, pointed a handgun at Williams, and ordered him to drive away or be shot.  Williams said he saw a sheriff's patrol car and just did as he was told.  Walker did not get back into the car but ran around the side of the building.  But Brown's friend (whom they had picked up) did get back into the car.  Williams drove off, and Deputy Sexton pursued.  Brown had the money bag, but at some point, he threw it out the window during the chase.

6

During his testimony, Williams was shown the surveillance videos of the robbery and pointed out that the man going behind the counter was wearing a different face mask than Williams had worn when he bought the Sprite drinks earlier that day. Also, Williams was wearing jeans that day, and in the video of the robbery, the individual who went around the corner was wearing black pants and a black and red cap. Williams testified that the belongings he had on him when he was booked included his blue Cubs baseball hat, his Mississippi ID card, and his Visa card that he had in his pants pocket, not in the vehicle. He was wearing the jeans and red tennis shoes that were shown in the photo of his property released from the Fayette County jail.

¶15.    In rebuttal, the State called Deputy Latch, who had participated in the pursuit until it ended in the cornfield. Latch testified that he saw only two men exit the vehicle. As he began to pursue the driver, Latch stopped at the vehicle to verify no one was inside. Latch then followed the driver until Latch lost his cell signal. According to Latch, Brown was arrested first, and then the driver, Williams, who was shirtless, was arrested.

¶16.    After being instructed and hearing closing arguments, the jury deliberated. At one point, they requested to view the surveillance videos, and they were brought back into the courtroom to do so. After further deliberation, the jury found Williams guilty of armed robbery. The circuit court immediately proceeded to the sentencing phase of the proceedings, during which the State called Gerald Evans Sr. of the Washington County Sheriff's Department in Greenville, Mississippi. He knew Williams as a dangerous gang member. White was re-called to testify about the impact that the robbery had on her personally, and

Detective Russell was also re-called to enter into evidence Williams's three prior felony convictions (two convictions in November 2006 for burglary of a dwelling and burglary of an automobile, and a 2009 conviction for felony fleeing).

¶17.    After the State rested, Williams called his sister, Jessica Williams, to testify. She said that since he had moved to Memphis three years ago, Williams had turned his life around by working and being a father to his two children. Williams's mother, Sheila Williams, testified similarly. Williams also called Kishtaya Smith, with whom Williams was living. They had one child together, and she too testified that Williams's life had changed since moving to Memphis. Smith confirmed that Williams was working at two jobs and had not been in trouble since they moved. Williams also testified before the jury.

¶18.    The jury was instructed to determine whether they could unanimously agree to sentence Williams to life in prison. After deliberation, the jury reported to the court that they could not unanimously agree on such a sentence. The circuit court dismissed the jury. On November 17, 2021, the court found that the State met its burden in showing that Williams was a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2020) and sentenced Williams to serve twenty-five years day for day in the custody of the Mississippi Department of Corrections.

¶19.    On November 19, 2021, Williams filed a motion for a new trial, raising a *Batson* challenge to the jury composition[3] and also arguing that the evidence presented to the grand

---

[3] During voir dire, Williams challenged the State's striking of three young blacks under *Batson v. Kentucky*, 476 U.S. 79 (1986). The circuit court granted one of the defense's challenges but denied the other two. The court accepted the State's non-discriminatory reasons for striking the other two, which included the State's discovery of a

jury was tainted; that key witnesses, especially White, were unreliable and incredible; that the jury had been allowed to return to the courtroom to view the video footage; that Williams's family had been excluded from the courtroom; that the genetic testing excluded Williams; that Gerald Evans's testimony during the sentencing phase was irrelevant and prejudicial; and that the verdict was contrary to the weight of the evidence. On December 16, 2021, Williams prepared a pro se motion for retrial raising numerous additional issues, but this motion was not filed with the circuit clerk until January 3, 2022. On January 12, 2022, the circuit court denied Williams's first motion for a new trial on its merits and dismissed the pro se motion as untimely.

¶20.    On January 28, 2022, Williams filed a notice of appeal. Despite the numerous bases pleaded in Williams's motions for a new trial, he raises only one issue on appeal, namely that his trial counsel's representation was constitutionally ineffective. Neither party stipulated to the sufficiency of the record for our review.

## Standard of Review and Discussion

¶21.    "Our standard of review for a claim of ineffective assistance of counsel is a two-part test: the defendant must prove, under the totality of the circumstances, that (1) his attorney's performance was deficient and (2) the deficiency deprived the defendant of a fair trial." *Winding v. State*, 908 So. 2d 163, 166 (¶14) (Miss. Ct. App. 2005); *accord Burnside v. State*, 882 So. 2d 212, 216 (¶20) (Miss. 2004). This Court focuses on whether the defendant's counsel's performance fell below an objective standard of reasonableness. *Simon v. State*,

drawing of a marijuana leaf and a bong on one prospective juror's Facebook posts and the fact that another potential juror had been a client of the defense attorney in the past.

857 So. 2d 668, 682 (¶23) (Miss. 2003). "Defense counsel is presumed competent, and this Court indulges a strong presumption that counsel's conduct is within the wide range of reasonable professional assistance." *Id*. There is also a presumption that decisions made by defense counsel are strategic, and this Court "will not second-guess counsel's decisions that fairly may be characterized as strategic." *McCray v. State*, 263 So. 3d 1021, 1027 (¶14) (Miss. Ct. App. 2018) (citing *Shinn v. State*, 174 So. 3d 961, 966 (¶12) (Miss. Ct. App. 2015)).

¶22. Finally, we look "at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial." *Howell v. State*, 163 So. 3d 240, 259 (¶49) (Miss. 2014) (quoting *Williams v. State*, 73 So. 3d 1125, 1129 (¶12) (Miss. 2011)). Moreover, to establish constitutionally ineffective assistance of counsel Williams must also show that his counsel's actions prejudiced him to the extent that he was denied a fundamentally fair trial. *Dickerson v. State*, No. 2015-DR-00954-SCT, 2021 WL 1309768, at *10 (¶46) (Miss. Apr. 8, 2021).

> To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Our review is highly deferential to the attorney, with a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance.

*Id*. at *9 (¶41) (citations omitted).

¶23. "Ineffective-assistance-of-counsel claims should ordinarily be raised in a [motion] for post-conviction relief, not on direct appeal." *Hamer v. State*, No. 2019-KA-01633-COA, 2022 WL 680013, at *8 (¶48) (Miss. Ct. App. Mar. 8, 2022) (citing *Hamlin v. State*, 306 So.

10

3d 843, 844 (¶2) (Miss. Ct. App. 2020)). "The Court will address such claims on direct appeal when (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate, and the appellate court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id*.

¶24. In this case, on appeal, Williams bases his ineffective-assistance-of-counsel claim on his attorney's failure to object to opinion testimony given by Detective Russell and to his attorney's eliciting inculpating hearsay from the same witness.

### A. Opinion Evidence

¶25. On direct examination, the State asked Russell the following questions with no objection from Williams's attorney:

> Q. What did your investigation ultimately reveal about who committed this armed robbery and if there was more than one person, what the roles of those -- of each individual was?
>
> A. Okay. My investigation revealed that Andrew Walker was the lookout, David Brown was standing at the door in the red shirt holding the gun while Charles Williams went behind the counter, grabbed the bank bag, and then they all left, fled the scene.
>
> Q. Was there ever any evidence you collected that contradicted those roles that the three played?
>
> A. No.
>
> Q. Based on your investigation, did they all actively participate in the armed robbery?
>
> A. Yes.
>
> Q. Was there ever a time from when you responded [to] the store until now that there's been any evidence that any of the three did not actively participate in this armed robbery?
>
> A. No.
>
> Q. Okay. Any evidence that they did not voluntarily participate in this crime?
>
> A. No.

11

Q. Based on your investigation, did you charge Charles Williams with a crime?
A. I did.
Q. What did you charge him with?
A. Armed robbery.

Williams cites *Taylor v. State*, 167 So. 3d 1143 (Miss. 2015), to support his argument that trial counsel's failure to object to the entry of damaging evidence constitutes ineffective assistance of counsel. The principle is sound in general but may be limited by the facts of a case and the nature of the objection. In *Taylor*, defense counsel failed to object to the State's cross-examination of the defendant on his prior felony convictions. *Id*. at 1144 (¶1). The Court of Appeals affirmed Taylor's conviction, *Taylor v. State,* 167 So. 3d 1239 (Miss. Ct. App. 2014), but the Mississippi Supreme Court, on writ of certiorari, reversed because evidence of other crimes is clearly inadmissible under Mississippi Rule of Evidence 404(b). *Taylor*, 167 So. 3d at 1146 (¶6).

¶26. Here, Williams provides no authority for the clear inadmissibility of Russell's statements concerning the results of her investigation. But there have been instances where courts have allowed such testimony. In *Manning v. Epps*, 695 F. Supp. 2d 323 (N.D. Miss. 2009), *overruled on other grounds*, 688 F. 3 177, 182 (5th Cir. 2012), as partial grounds for his entitlement to habeas corpus relief, the defendant argued that during his murder trial, on re-direct examination, the sheriff "was allowed to give a speculative opinion as to how the murders transpired." *Id*. at 376. The federal district court noted that the defense had opened the door for such testimony during its cross-examination, which the Mississippi Supreme Court had held in Manning's direct appeal. *Id.* at 377. However, the federal court went

12

further and found that the sheriff's testimony on his theory of the case was admissible under Rule 701 of the Mississippi Rules of Evidence, which allows a lay witness to provide testimony "limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Manning*, 695 F. Supp. 2d at 377. Rule 701 of the Mississippi Rules of Evidence mirrors Rule 701 of the Federal Rules of Evidence. *Manning,* 695 F. Supp. 2d at 377; *see also Hall v. State*, 691 So. 2d 415, 420 n.3 (Miss. 1997) (noting that the Mississippi Rules of Evidence generally mirror the Federal Rules of Evidence). The federal court concluded:

> In this case, Sheriff Bryan inferred how the crime occurred based upon the known facts. The testimony offered by Sheriff Bryan came about as a direct result of defense counsel's questioning, and based upon a reading of the record, there is no reasonable basis to believe the jury could not distinguish between the factual evidence and Sheriff Bryan's theories, as he clearly delineated them as his opinion. Sheriff Bryan was present at the crime scene and had first-hand knowledge of the facts from which he drew reasonable inferences.

*Manning*, 695 F. Supp. 2d at 377.

¶27. Similarly, in *Travis v. State*, 972 So. 2d 674, 882-83 (¶35) (Miss. Ct. App. 2007), we found no error when a police officer testified that based on his investigation, he believed the defendant was driving the car that hit the victim even though there was no witness to the collision. We found:

> Sergeant Henderson personally observed numerous facts and circumstances at the scene of the accident. Based on those personal observations, Sergeant Henderson formed his opinion that Travis operated Winston's vehicle.

13

> Additionally, the prosecution asked Sergeant Henderson whether Travis indicated which car he had been driving. Sergeant Henderson testified that "[i]t seems like [Travis] did." A rational juror could conclude that Travis had been driving one of the two cars. On cross-examination, Travis's attorney asked Sergeant Henderson what caused him to conclude that Travis drove the other car. Sergeant Henderson testified that he concluded that Travis was driving based on Travis's presence, the presence of emergency responders, and "common sense." All things considered, we cannot find that the circuit court abused its discretion, particularly where the substance of the testimony at issue went before the jury without objection.

*Id*.

¶28. In this case, Detective Russell was placed in charge of the investigation of the Culver Grocery robbery. She interviewed witnesses and observed the surveillance videos of the robbery and Williams's prior purchase at the store. She collected the evidence and determined what items needed DNA testing and reviewed the results. We find that Russell's answer to the State's question comported with the requirements of Rule 701 of the Mississippi Rules of Evidence because her opinions were rationally based on what she saw and concluded. Moreover, Williams admitted that he wore a white t-shirt that day, as did the robber who took the money bag, but when he was arrested, Williams had taken his white t-shirt off. White's testimony was inconsistent with every other witness's testimony concerning the number of people involved. For example, White claimed there were three people in the car when they fled the scene, but law enforcement pursuing them at high speeds saw only two people exit the vehicle. From all the evidence, a rational juror could conclude just as Russell did, namely that Brown wore a red shirt and stood at the door, Williams wore a white t-shirt and went around the counter and grabbed the money bag, and Walker stood as the lookout. Thus, even if Williams had objected, the circuit court would not have abused

14

its discretion in allowing Russell's theory of the case to be heard by the jury.

¶29.    Williams also contends that Russell's testimony was inadmissible because it was an opinion on the ultimate issue in the case. Williams cites *Jackson v. State*, 551 So. 2d 132 (Miss. 1989), as support; however, that case does not persuade us to concur with Williams's argument. In *Jackson*, the defendant reported that his wife had been assaulted and killed by a robber who had broken into their car dealership around 8:50 p.m. while he and his wife were there. *Id*. at 135. But Jackson's various statements describing the assailant were inconsistent, the bank bag containing receipts for the day was found in the safe that Jackson claimed he had been forced to open, and Jackson's testimony about the locked door was different from an employee who testified that he passed by the shop that night. *Id*. at 136-37. Jackson was eventually charged and found guilty of manslaughter. *Id*. At trial, a law enforcement investigator was allowed to describe to the jury a reenactment of Jackson's written version of the events that happened. *Id.* at 138. On appeal, the Mississippi Supreme Court found no error in allowing the officer's testimony concerning the reenactment. *Id*. at 139. Law enforcement officers also testified that they had met and discussed the interviews and leads, and they were unable to find anyone who placed anybody other than Jackson at the dealership as a potential assailant. *Id*. at 140. The supreme court upheld allowing this opinion testimony, stating:

> Again, we must be specific. Dickerson did not say "In my opinion Jackson killed his wife." He did say that, after more than two months of extensive investigation, he could come up with no evidence that anyone besides Jackson and his wife were at the Red Carpet Motor premises on the night of March 12. This was a statement importing an opinion. Yet, it was rationally based upon his personal perceptions. More important, the triers of fact charged to decide

Jackson's guilt or innocence, badly needed to know whether law enforcement investigators had found evidence that anyone else was present at Red Carpet Motors at the time in question. Defense counsel would certainly have been within their rights to try to extract from Dickerson that his investigation suggested the presence of a third person, had that been the case. To the extent that Dickerson's conclusory testimony cast doubt upon Jackson's theory of an armed robbery on the night in question, it certainly went to the issue of Jackson's guilt. If the testimony had not related to an issue of material fact in controversy, it would not have been relevant.

Put in proper context, the statements at issue are a summing up of what Officer Dickerson had already stated, viz. that he and the others had carefully checked out every detail of Jackson's story and every other lead anyone had suggested before the offensive question was asked.

*Id.* at 142.

¶30. Similarly, Russell merely summarized her findings for the jury in this case. Moreover, even if Russell's summary testimony violated the Mississippi Rules of Evidence, the error was harmless because there was substantial credible evidence presented to the jury supporting its guilty verdict. An error is harmless if it is clear beyond a reasonable doubt that, absent the error, the jury would have found the defendant guilty. *Miskell v. State*, 270 So. 3d 23, 35 (¶44) (Miss. Ct. App. 2018). In this case, the jury heard White's eyewitness testimony identifying Williams as the one who took the money bag. The jury heard Williams's own testimony that he participated in the robbery, albeit allegedly unwillingly. The surveillance videos showed that the robber who took the money bag was wearing a white t-shirt that Williams admitted he also was wearing. Brown and Williams fled in the vehicle Williams drove. Although Williams testified about the participation of a third, un-named individual, law enforcement officers who followed the vehicle at high speeds all testified that only two men exited the car. When apprehended in the cornfield, Williams did not surrender

16

or tell the police he had been a hostage, but instead, he fled and hid until dark. Whether his participation was voluntary or involuntary was the jury's call. It did not need Russell's testimony to reach a guilty verdict. Accordingly, because there was no reversible error in the admission of Russell's summary testimony, Williams's failure to object did not constitute ineffective assistance of counsel.

### B.     Hearsay

¶31.    Williams also contends that his attorney rendered ineffective assistance of counsel when he cross-examined Detective Russell and elicited damaging testimony for the defense. Specifically, Williams's defense counsel asked Russell about her interrogation of Andrew Walker:

> Q.    And who did you interview? Did you interview Andrew Walker?
> A.    I did.
> Q.    Okay. And what evidence, if any, were you able to obtain from him?
> A.    Are you referring to his -- our interview?
> Q.    Yes.
> A.     Okay. During Andrew Walker's interview with me, he had told me that he was in the vehicle with Charles Williams and David Brown.
> Q.    Um-hmm.
> A.    And that he heard the defendant say they were going to go hit a lick.
> Q.    Um-hmm.
> A     Which means they're going to go get some money, rob somebody. That's slang for that.
> Q.    Um-hmm.
> A.    And he said that he also saw David Brown with a gun.

¶32.    Mississippi Rule of Evidence 801(c) defines "hearsay" as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." The way in which Russell answered the defense counsel's question constituted inadmissible, testimonial

17

hearsay. *See Washington v. Kelsey*, 990 So. 2d 242, 246 (¶¶11-13) (Miss. Ct. App. 2008) (holding it was error to allow accident victim to testify that neighbor told the driver "that he needed to slow down because he was going to get somebody hurt"). However, defense counsel went on to establish that Walker previously had lied to Russell twice—when Walker told her that he had gone jogging that morning and when he said that he had nothing to do with the robbery. It appears from defense counsel's line of questioning that he intended to elicit the initial testimony so that he could show Walker was a liar and not to be believed, even about Williams's involvement in the robbery. Williams has not overcome the strong presumption that his counsel's decision to question Russell in this way was strategic and reasonable. "It is a long-held principle that strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Hutto v. State*, 286 So. 3d 653, 666 (¶56) (Miss. 2019). Williams's counsel filed appropriate motions and made other objections during the trial. Looking at the totality of the circumstances, we find no merit to Williams's claim of ineffective assistance of counsel based on his attorney's questions to Russell.

## Conclusion

¶33. Because the record before us does not affirmatively show an ineffectiveness of counsel of constitutional dimensions, we find no merit to Williams's claim of ineffective assistance of counsel, and we affirm his conviction and sentence.

¶34. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE AND SMITH, JJ., CONCUR. WILSON, P.J., McCARTY AND EMFINGER, JJ.,**

18

**CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**