# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-KA-01595-SCT

*DANIEL LUTHER BEASLEY a/k/a DANIEL*
*BEASLEY a/k/a DANIEL L. BEASLEY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/19/2012 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| COURT FROM WHICH APPEALED: | AMITE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | PHILLIP W. BROADHEAD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: STEPHANIE B. WOOD |
| DISTRICT ATTORNEY: | RONNIE LEE HARPER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/16/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND PIERCE, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Daniel Luther Beasley appeals from the verdict of an Amite County jury finding him

guilty of murder.  Finding no reversible error, we affirm.

## FACTS

¶2.     Janie Wilkinson owned a beauty salon behind her house in Liberty, Mississippi.  She

converted the salon into an apartment and allowed her nephew Daniel Beasley to live there.

At a family gathering at Wilkinson's house on Easter weekend of 2011, Wilkinson discussed converting the apartment back into a beauty salon for her granddaughter to operate. Wilkinson told Beasley that he would have to move out of the apartment at some point so she could begin renovations on the salon. Wilkinson later told her son Bill Baggett that Beasley had become very upset about having to move out of the apartment.

¶3. On May 14, 2011, Wilkinson went to Martha Kello's house to play cards. When she arrived, she was visibly upset about an incident with Beasley earlier in the day. Wilkinson had locked herself out of her house earlier in the day, so she asked Beasley to crawl through a window to retrieve the keys. Beasley had felt Wilkinson's pockets to see if she had actually left the keys in the house, and this apparently had upset Wilkinson. Wilkinson played cards at Kello's house until approximately 7:00 p.m. and then returned home. This was the last time she was seen alive.

¶4. Kello called Wilkinson several times over the next two days, but Wilkinson never answered the phone. Kello became concerned, because she and Wilkinson usually talked on a regular basis, so she called Wilkinson's sister Mary Artman. Artman had not heard from Wilkinson either.

¶5. Kello went to Wilkinson's house on May 16, 2011, to check on her. She knocked on the front door and did not get an answer. The doors to the house were locked, but she noticed that the lights were on in the back of the house. Kello then went to pick up Artman, who had a spare key to the house, and then returned. Kello and Artman entered the house and found Wilkinson's dead body wrapped in a comforter in the back bedroom. She was wearing the same clothes she had been wearing at Kello's house two days earlier.

2

Wilkinson's head was covered in blood, and blood was splattered on the walls and furniture in the room. Artman testified that she was so upset by the scene that she forgot to call 9-1-1. Instead, Artman called a store where she previously had worked and told them what had happened. An employee at the store then called 9-1-1.

¶6. Officer Sean Umbrello of the Liberty Police Department was the first to arrive on the scene. Umbrello described the scene as follows:

> Large amount of blood in that room and also the hallway leading back to that room from the kitchen, there was drops of blood in the hall, and they stopped in the kitchen next to a counter where there was a purse on top of the counter.

The police found Wilkinson's dog dead in a trash can just outside the house. The police did not find evidence of forced entry, and no items had been stolen from the house.

¶7. Anna Savrock, a crime-scene investigator with the Mississippi Bureau of Investigation, performed an investigation of Wilkinson's home and Beasley's apartment shortly after the first responders arrived. Savrock noticed that Wilkinson's arm was hanging in the air in an unnatural position due to rigor mortis and determined that Wilkinson's body probably had been moved between ten and twelve hours after her death. During her investigation of Beasley's apartment, Savrock found a bloody napkin in a trash can and noticed that the counters in Beasley's bathroom were still wet. Using a chemical called Blue Star, Savrock found traces of what appeared to be blood in Beasley's shower. Savrock explained that Blue Star reacts with bleach, as well as blood, but opined that the pattern of particles in Beasley's shower was not consistent with a cleaning action.

¶8. Later that day, police officers found bloody clothes in a dumpster behind the local Exxon station. LaDonna Chapman, a cashier at the Exxon station, testified that she had seen

3

Beasley behind the Exxon station when she was taking trash to the dumpster. In the dumpster, Chapman saw a jacket that Beasley had been wearing earlier. Chapman testified that she recognized Beasley because he came to the Exxon station almost every day. The police collected a blue hooded sweatshirt and gray sweat pants from the dumpster and sent cuttings from each to the Mississippi Crime Laboratory for testing. Joseph Cothern, an officer with the Liberty Police Department, testified that he had seen Beasley wearing these same clothes while he was walking down Main Street in Liberty on May 14, 2011. The blood found on the sweatshirt and sweat pants was determined to be consistent with a reference DNA sample taken from Wilkinson. DNA taken from skin cells found on the inside of the sweat pants was found to be consistent with a reference DNA sample taken from Beasley.

¶9.    Dr. Mark Levon, chief medical examiner for the State of Mississippi, performed the autopsy of Wilkinson's body. Dr. Levon indicated that Wilkinson's body had undergone "post mortem changes," meaning that she had been dead for some time before she was discovered. Dr. Levon determined that the cause of Wilkinson's death was multiple sharp-force trauma, and that the manner of death was homicide. Wilkinson had suffered multiple blunt-force injuries, as well as sixteen "sharp force or cut or chop type injuries made to the head and neck area," the most severe of which resulted in actual cutting of the skull. While no murder weapon was ever recovered,[1] Dr. Levon indicated that Wilkinson's injuries could

---

[1]Investigators found a hatchet under a bed in another room of the house, but they determined that the hatchet had not been recently used. Investigators also noticed that a knife was missing from the block in Wilkinson's kitchen. The knife was never recovered.

4

have been caused by a hatchet, ax, or machete. During the autopsy, Dr. Levon discovered that Wilkinson also had sustained some defensive wounds to her hands, indicating that some sort of struggle had taken place before her death.

## STATEMENT OF THE CASE

¶10. Beasley was arrested and indicted for deliberate-design murder. Beasley's indictment indicates that the State sought an enhanced penalty for the commission of a felony against a victim over the age of sixty-five. Prior to trial, Beasley filed a motion for mental evaluation to determine his competency to stand trial. The trial court granted this motion and ordered Beasley to undergo a competency examination. After the examination had been conducted, the trial court held a competency hearing and determined that Beasley was competent to stand trial.

¶11. A jury trial was conducted in the Circuit Court of Amite County, Mississippi, on September 18-19, 2012. Beasley chose to testify in his own defense. He claimed that, on the day of the murder, he was in his apartment when he heard loud noises coming from Wilkinson's house. He stated that he became scared and ran into the woods behind the apartment. After fifteen or twenty minutes, Beasley claimed that he returned to Wilkinson's house and went inside, where he found her dead body lying face-down. Beasley rolled her over to identify her and then moved her away from the back door of the house. Beasley admitted that he put Wilkinson's dog in a trash can, but he denied killing the dog. He also admitted that he threw his bloody clothes into the dumpster behind the Exxon station. He claimed that he threw his clothes away because he was afraid the clothes would implicate him in the murder. Beasley never contacted the police or medical personnel.

5

¶12.   At the conclusion of the trial, the jury returned a unanimous verdict finding Beasley guilty of murder. The court sentenced Beasley to life imprisonment. After the trial court denied Beasley's post-trial motions, Beasley appealed to this Court, raising the following issues:

    **I.**      **Did the trial court err in failing to conduct a hearing to determine Beasley's competency to stand trial?**

    **II.**      **Did the trial court abuse its discretion in admitting cumulative photographs depicting the crime scene and the victim's autopsy?**

    **III.**      **Did the trial court err in failing to sustain the appellant's motion for judgment notwithstanding the verdict, or, in the alternative, a new trial?**

## DISCUSSION

    **I.**      **Did the trial court err in failing to conduct a hearing to determine Beasley's competency to stand trial?**

¶13.   A criminal defendant has a constitutional right not to be tried while legally incompetent. *See Drope v. Missouri*, 420 U.S. 162, 171-72, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). Putting a defendant on trial when his mental state is "so clouded that he cannot remember and intelligently relate what occurred at the time of the commission of the offense, is a denial of due process and contrary to public policy[.]" *Emanuel v. State*, 412 So. 2d 1187, 1188 (Miss. 1982). In order to be deemed competent to stand trial, a defendant must have the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and . . . a rational as well as factual understanding of the proceedings against him." *Dusky v. U.S.*, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam). This Court will not overturn a trial court's finding that a defendant is

competent to stand trial unless such finding was "manifestly against the overwhelming weight of the evidence." *Martin v. State*, 871 So. 2d 693, 698 (Miss. 2004) (quoting *Emanuel*, 412 So. 2d at 1189).

¶14. Our trial courts follow the procedures articulated in Rule 9.06 of the Uniform Rules of Circuit and County Court Practice to determine whether a criminal defendant is competent to stand trial. The rule provides:

> If before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court . . . .
>
> After the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial. After hearing all the evidence, the court shall weigh the evidence and make a determination of whether the defendant is competent to stand trial. If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and the case will then proceed to trial.

URCCC 9.06. Simply put, Rule 9.06 "mandates that a competency hearing be conducted following a court-ordered mental examination." *Hearn v. State*, 3 So. 3d 722, 730 (Miss. 2008).

¶15. Beasley argues that the trial court violated his constitutional rights by failing to hold an adequate on-the-record hearing to determine his competency to stand trial. This Court has found reversible error where a trial court orders a criminal defendant to undergo a mental evaluation but fails to meet the remaining requirements of Rule 9.06. *See Sanders v. State*, 9 So. 3d 1132, 1139 (Miss. 2009); *Jay v. State*, 25 So. 3d 257, 263 (Miss. 2009) (reversing and remanding for a new trial subject to a competency hearing, where the record contained no evidence of a competency hearing or explicit findings by the trial court regarding the

7

defendant's competency to stand trial). However, it is clear from the record that the trial court complied with all requirements of Rule 9.06.

¶16. Prior to trial, Beasley's attorney filed a motion for a mental evaluation to determine whether Beasley was competent to stand trial. The trial court granted the motion, finding that "[t]here is a legitimate question raised of the defendant's mental competency," and ordered Beasley to undergo psychiatric evaluation at the Mississippi State Hospital at Whitfield. Beasley was examined by Dr. William C. Lott on September 4, 2012. The trial court then held a competency hearing on September 14, 2012. The trial judge indicated that Dr. Lott had submitted a detailed report to the court and ordered a copy of the report to be admitted as an exhibit at the hearing. In his report, Dr. Lott determined that Beasley "has the sufficient present ability to confer with his attorney with a reasonable degree of rational understanding and he has a good factual and rational understanding of the nature and object of the proceedings against him." The trial judge asked Beasley's attorney if he had anything further to present on the issue of competency. Beasley's attorney replied, "No, Your Honor." The trial judge asked the same question to Beasley and the prosecutor. Both answered in the negative. The trial court then held:

> Let the record show that upon hearing of the – on the motion for the defendant's competency and the report of Dr. Lott being ordered and admitted into evidence on this hearing, the Court finds that the defendant is competent to stand trial for the reasons set out in Dr. Lott's report, and therefore, he will be found competent to stand trial.

Beasley's trial commenced four days later.

¶17. We find that the trial court followed all requirements of Rule 9.06 in determining that Beasley was competent to stand trial. Beasley simply chose not to present any witnesses or

8

other testimony to dispute Dr. Lott's opinion that Beasley was competent to stand trial. The trial court's determination was not manifestly against the overwhelming weight of the evidence. Accordingly, Beasley's argument is without merit.

**II.    Did the trial court abuse its discretion in admitting photographs depicting the crime scene and the victim's autopsy?**

¶18.    Beasley argues that the trial court erred in allowing the prosecution to "bombard[] the jury with photographs of the gruesome murder," because "this prosecutorial ploy inevitably resulted in a fundamentally unfair trial." Beasley argues that certain photographic exhibits were so unnecessarily gruesome that they could only serve to inflame the passion of the jury.

¶19.    We find that Beasley's argument is procedurally barred for lack of contemporaneous objection. Beasley did not object to the admission of any of the State's twenty-four photographic exhibits. Upon the State's request to admit each of the now complained-of exhibits, the trial court asked Beasley if he had any objection. Beasley replied, "No, Your Honor," each time. "This Court has repeatedly held that '[i]f no contemporaneous objection is made, the error, if any, is waived.'" *Walker v. State*, 671 So. 2d 581, 597 (Miss. 1995) (quoting *Cole v. State*, 525 So. 2d 365, 369 (Miss. 1987)). *See* *Barfield v. State*, 22 So. 3d 1175, 1180-81 (Miss. 2009) (applying the procedural bar to defendant's claim that gruesome photographs admitted into evidence were unfairly prejudicial; failure to object at trial barred consideration of the issue on appeal). Beasley waived his claim of error regarding the photographs by failing to object to their admission at trial.

¶20.    Beasley admits that he failed to object to the admission of the crime-scene and autopsy photographs at trial. Nevertheless, he argues that the trial court's decision to admit

9

these photographs into evidence was plain error. *See Foster v. State*, 639 So. 2d 1263, 1289 (Miss. 1994) (citing *Gray v. State*, 487 So. 2d 1304, 1312 (Miss. 1986) ("The defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal.")). The plain-error doctrine is implicated when an error occurs at trial which affects substantial rights and results in "a manifest miscarriage of justice." *Gray v. State*, 549 So. 2d at 1316, 1321 (Miss. 1989). Thus, procedural bar notwithstanding, we will discuss the merits of this issue to determine whether the introduction of these exhibits denied Beasley his right to a fair trial.

¶21. This Court reviews the admission of photographs for abuse of discretion, but the trial court's discretion in deciding whether to allow the admission of photographs "runs toward almost unlimited admissibility." *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987). Even if the photograph is "gruesome, grisly, unpleasant, or even inflammatory," it still may be admitted so long as it has "probative value and its introduction serves a meaningful evidentiary purpose." *Noe v. State*, 616 So. 2d 298, 303 (Miss. 1993) (string citation omitted). A photograph has a "meaningful evidentiary purpose" when it aids in describing the circumstances of the killing, describes the location of the body and cause of death, or supplements or clarifies witness testimony. *Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995) (citations omitted).

¶22. At trial, the State sought to admit a set of photographs depicting the scene of the crime. Specifically, the State presented Exhibits 8 and 9 during the testimony of Ellis Hollingsworth, a Mississippi Highway Patrol officer, to help describe the location and condition of Wilkinson's body when she was discovered. The photographs were taken at

different angles. Exhibit 8 is a low-angle shot of Wilkinson's upper body. Exhibit 9 was taken from directly over Wilkinson's body and more clearly depicts her face.

¶23. The State also introduced photographs from Wilkinson's autopsy, depicting Wilkinson's specific injuries. Specifically, Exhibits 25, 26, and 27 were admitted during the testimony of Dr. Mark Levon, the medical examiner who performed Wilkinson's autopsy. Exhibit 25 depicts the back of Wilkinson's head and shows several significant gashes on her scalp. Exhibit 26, which was taken after Wilkinson's head had been shaved, allows a better view of the wounds. Exhibit 27 is similar to Exhibit 26 but is more centered on the back of Wilkinson's head.

¶24. In support of his argument that the admission of these photographs was error, Beasley relies on *McNeal v. State*, 551 So. 2d 151 (Miss. 1989), where this Court reversed a criminal defendant's murder conviction based on the admission of certain photographic exhibits. The photographs introduced by the State in *McNeal* were described by this Court as "some of the most gruesome photographs ever presented to this Court." *Id.* at 159. Specifically, the life-sized, full-color photographs depicted the victim's nude and partially decomposed body, including a full-color, close-up view of the victim's decomposed, maggot-infested skull. *Id.* This Court held that, in deciding whether to admit particularly graphic photographs into evidence, the trial court must consider: "(1) whether the proof is absolute or in doubt as to identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury." *Id.* While the State argued that the photographs were necessary to prove the manner of the victim's death, this Court found that they had little or no evidentiary value when compared

11

with their tendency to inflame and prejudice the jury. *Id.* This Court could not say that the admission of the photographs did not substantially and adversely affect the defendant's right to a fair trial. *Id.* at 160 (citing Miss. R. Evid. 103).

¶25. Notwithstanding the procedural bar, we find that Beasley's claim is without merit. While some of the photographs are particularly graphic, even the *McNeal* Court reasoned that "we do not presume to conclude that every gruesome photograph admitted into evidence constitutes an abuse of discretion[.]" *Id.* at 159. "*Some* probative value is the only requirement needed in order to support a trial judge's decision to admit photographs into evidence." *Chamberlin v. State*, 989 So. 2d 320, 340 (Miss. 2008) (emphasis added) (quoting *Jones v. State*, 920 So. 2d 465, 476-77 (Miss. 2006)). Unlike the photographs in *McNeal*, the challenged photographs in this case had probative evidentiary value, as they described the circumstances and location of the killing, illustrated the cause and manner of Wilkinson's death, and supplemented the testimony of several witnesses.

¶26. Exhibits 8 and 9 described the circumstances of the killing and the location of the body and were used to supplement the testimony of the officers who found Wilkinson's body. "[T]his Court has consistently allowed photographic evidence to support the testimony of witnesses . . . who described the scene upon their respective arrivals." *McFee v. State*, 511 So. 2d 130, 135 (Miss. 1987) (citations omitted). *See Parker v. State*, 119 So. 3d 987, 993 (Miss. 2013) (holding that trial court did not abuse its discretion in admitting photographs of murder scene and victim's gunshot wounds, even though defendant admitted to shooting the victim, since the photographs "described the location of the body" and "supplemented or clarified" the investigating officer's testimony). In addition, Exhibits 25,

12

26, and 27 supplemented Dr. Levon's opinions regarding the cause and manner of death. These exhibits aided the State in proving an essential element of the crime – that Wilkinson was murdered with deliberate design. Deliberate design may be proved or inferred from the use of a deadly weapon. *See Higgins v. State*, 725 So. 2d 220, 224 (Miss. 1998) (citations omitted). Because no murder weapon was ever recovered, Exhibits 25, 26, and 27 were necessary to supplement Dr. Levon's opinion that Wilkinson's fatal injuries were caused by a hatchet, ax, or machete, any of which the jury could have considered to be a deadly weapon when used to inflict the wounds depicted in the photographs.

¶27. Because the challenged exhibits had evidentiary value in describing the scene of the crime and the manner of the victim's death, and notwithstanding the procedural bar, we find that the trial court did not abuse its discretion in admitting the State's photographic exhibits.

**III.  Did the trial court err in failing to sustain the appellant's motion for judgment notwithstanding the verdict, or, in the alternative, a new trial?**

¶28. After the jury reached its verdict, Beasley filed a motion for judgment notwithstanding the verdict (JNOV), or, in the alternative, a new trial. The trial court denied this motion. On appeal, Beasley argues that evidence presented against him was legally insufficient to establish that he murdered Wilkinson. Alternatively, he argues that the jury's verdict is against the overwhelming weight of the evidence. "The standard of review for a post-trial motion is abuse of discretion." *Dilworth v. State*, 909 So. 2d 731, 736 (Miss. 2005) (citing *Howell v. State*, 860 So. 2d 704, 764 (Miss. 2003)).

**A.  Whether Beasley is entitled to JNOV.**

¶29.    "A motion for [JNOV] challenges the legal sufficiency of the evidence." *Ivy v. State*, 949 So. 2d 748, 751 (Miss. 2007) (citing *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)). "[T]he critical inquiry is whether the evidence shows 'beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed[.]'" *Id.* (quoting *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968)).  In reviewing the sufficiency of the evidence, this Court will view all evidence in the light most favorable to the verdict.  *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005). If this Court determines that "reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," this Court will hold that the evidence was legally sufficient to support the jury's verdict.  *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985).  The instant case was a "circumstantial-evidence case," as Beasley did not confess to the crime, nor were there any eyewitnesses to the crime. *See Jones v. State*, 918 So. 2d 1220, 1234 (Miss. 2005) (citations omitted).  Thus, the State had the burden of proving Beasley's guilt "not only beyond a reasonable doubt, but to the exclusion of every reasonable hypothesis consistent with innocence."  *Leflore v. State*, 535 So. 2d 68, 70 (Miss. 1988) (citing *Guilbeau v. State*, 502 So .2d 639, 641 (Miss. 1987)).  A conviction based on circumstantial evidence will not be disturbed unless it is opposed by a "decided preponderance of the evidence."  *Id.*

¶30.    Beasley was charged with murder in violation of Section 97-3-19(1)(a) of the Mississippi Code, which provides "The killing of a human being without the authority of law by any means or in any manner shall be murder . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being . . . ."  Miss. Code Ann. § 97-3-

14

19(1)(a) (Rev. 2006). In order to convict Beasley of murdering Wilkinson, the State was required to prove that Beasley: (1) killed Wilkinson; (2) without authority of law; and (3) with deliberate design to effect her death. *Id. See also* ***Dilworth***, 909 So. 2d at 736. It is undisputed that the State proved that Wilkinson was the victim of a homicide. However, Beasley argues that the State failed to present sufficient evidence proving that he was Wilkinson's killer, or that he acted with deliberate design to effect her death.

¶31. Turning to the evidence in this case, we find that the State presented sufficient evidence proving that Beasley killed Wilkinson. Witnesses for the State testified without objection that Wilkinson had told them that Beasley was upset with her for making him move out of the apartment, where he had lived rent-free for more than a year. Beasley also was able to enter Wilkinson's house without a key. This fact could have allowed the jury to rule out an unknown intruder as the killer, since the doors to Wilkinson's house were still locked when she was found, and since there was no evidence of forced entry or theft. On the last day she was seen alive, Wilkinson was visibly upset about a dispute with Beasley. Beasley admitted to discarding blood-stained clothes into a dumpster at a local gas station, and a DNA sample taken from the blood was consistent with Wilkinson's DNA.

¶32. We also find that the State presented sufficient evidence showing that Beasley acted with deliberate design. As previously noted, deliberate design may be proved or inferred from the use of a deadly weapon. ***Higgins***, 725 So. 2d at 224 (Miss. 1998) (citations omitted). The existence of a deadly weapon is a question of fact for the jury to decide. ***Davis v. State***, 530 So. 2d 694, 702 (Miss. 1988) (citing ***Duckworth v. State***, 477 So. 2d 935, 938 (Miss. 1985)). The crime-scene photographs presented by the State clearly illustrate the

15

scene of a brutal murder. Dr. Levon indicated that Wilkinson had suffered sixteen separate traumatic injuries, including several severe cutting-type injuries to the skull likely caused by an ax, hatchet, or machete. Dr. Levon also indicated that Wilkinson had suffered several defensive-type wounds to her hands, suggesting that a struggle had taken place. Although the jury was instructed on manslaughter, the evidence produced at trial could lead the jury only to the conclusion that Wilkinson was deliberately murdered.

¶33. Having reviewed the evidence in the light most favorable to the State, we find that jury's verdict is not opposed by a "decided preponderance of the evidence," nor is it "based on no evidence whatsoever," which would require reversal of his conviction. *Kitchens v. State*, 300 So. 2d 922, 927 (Miss. 1974). Beasley's testimony conflicted with the scientific evidence presented by the State. Beasley claimed that he had found and moved Wilkinson's body about fifteen or twenty minutes after hearing a commotion inside Wilkinson's house. However, after examining Wilkinson's body, Savrock opined that the body likely was moved after rigor mortis had set in, ten to twelve hours after Wilkinson's death. Beasley also never explained why he allegedly ran into the woods after hearing screams coming from Wilkinson's house, or why he never contacted the police or medical personnel after finding Wilkinson's body. Circumstantial evidence need not exclude every "probable doubt," but only every other "reasonable" hypothesis of innocence. *Tolbert v. State*, 407 So. 2d 815, 820 (Miss. 1985). After hearing the evidence, the jury reasonably could have rejected Beasley's testimony as an unreasonable hypothesis of innocence.

¶34. In sum, we find that the evidence presented by the State was legally sufficient to allow the jury to find Beasley guilty of deliberate-design murder beyond a reasonable doubt and

16

to the exclusion of all reasonable hypotheses consistent with innocence. Accordingly, the trial court did not err in denying Beasley's motion for JNOV.

**B. Whether Beasley is entitled to a new trial.**

¶35. A motion for new trial challenges the weight of the evidence. *Sheffield v. State*, 749 So. 2d 123, 127 (Miss. 1999). In reviewing a challenge to the weight of the evidence, this Court will overturn a verdict only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844. *See also Amiker v. Drugs for Less, Inc.*, 796 So. 2d 942, 947 (Miss. 2000) (holding that a motion for a new trial is addressed to the discretion of the court and should be granted only "in exceptional cases in which the evidence preponderates heavily against the verdict."). As with challenges to the sufficiency of the evidence, this Court views all evidence in the light most favorable to the verdict. *Id.* Factual disputes are properly resolved by a jury and do not mandate a new trial. *Temple v. State*, 498 So. 2d 379, 382 (Miss. 1986).

¶36. While Beasley claims that the evidence presented by the State is "unsubstantiated" or "unconvincing," his specific arguments merely challenge the credibility of the State's witnesses. It is not for this Court to pass on the credibility of witnesses, for that is a jury function. *Bond v. State*, 162 So. 2d 510, 512 (Miss. 1964) (citation omitted). The jury in this case was presented with two opposing versions of the circumstances surrounding Wilkinson's death. The State presented significant circumstantial evidence portraying Beasley as Wilkinson's murderer. In response, Beasley took the stand in an attempt to rationalize the State's damning evidence, and his testimony is the only evidence inconsistent

17

with the jury's verdict. The jury was free to accept the testimony of some witnesses and reject that of others, and this Court "need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict." ***Brown v. State***, 796 So. 2d 223, 227 (Miss. 2001) (citations omitted). In this case, it is clear that the jury accepted the State's witnesses and evidence and rejected Beasley's testimony. Allowing the jury's verdict to stand in this case would not "sanction an unconscionable injustice," as the evidence does not "preponderate heavily against the verdict." ***Bush***, 895 So. 2d at 844. Accordingly, we find that the trial court did not err in denying Beasley's motion for a new trial.

## CONCLUSION

¶37. For the foregoing reasons, we affirm the jury's verdict finding Beasley guilty of murder and the judgment and sentence of the Amite County Circuit Court.

¶38. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED.**

**DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**