# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-01363-COA

**JOSHUA ALLEN MURRY A/K/A JOSHUA MURRY**          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

DATE OF JUDGMENT:      10/09/2020
TRIAL JUDGE:      HON. LEE SORRELS COLEMAN
COURT FROM WHICH APPEALED:      LOWNDES COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
     BY: MOLLIE MARIE McMILLIN
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
     BY: ALEXANDRA RODU ROSENBLATT
DISTRICT ATTORNEY:      SCOTT WINSTON COLOM
NATURE OF THE CASE:      CRIMINAL - FELONY
DISPOSITION:      AFFIRMED - 08/16/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., McCARTY AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1. After a Lowndes County jury convicted Joshua Murry of the first-degree murder of Jarrell Ward, the Lowndes County Circuit Court sentenced Murry to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). On appeal, Murry asserts the following arguments: (1) the circuit court committed plain error by allowing the State to make improper comments during cross-examination and closing arguments; (2) the circuit court committed plain error by admitting into evidence certain photographs of the victim; and (3) his trial attorney provided ineffective assistance of counsel. Finding no reversible error,

we affirm Murry's conviction and sentence.

**FACTS**

¶2.   On the evening of July 25, 2018, Murry attended a party in Columbus, Mississippi. After arriving at the party, Murry joined two Columbus acquaintances, Tremarcus Monroe and Greg Morris, in gambling that was taking place. During the course of the gambling, Murry, Monroe, and Morris (the Columbus group) began competing and betting against Ward, Emmanuel Dudley Jr., Jaylen Jernagin, and Corey Higgins from Starkville, Mississippi (the Starkville group). Murry testified at trial that by the time the party ended around 1 a.m. on July 26, 2018, he had lost about $300 to the Starkville group. After leaving the party, the Columbus group learned that the Starkville group planned to continue gambling at Dudley's apartment in Starkville. The Columbus group arranged to join the gambling at Dudley's apartment. Murry had driven to the party in his white Dodge Challenger, which had an Arkansas license plate, and he offered Monroe and Morris a ride to Starkville. Murry testified that the three men stopped by his residence, where he went inside and grabbed about $700 in cash, and then the Columbus group drove to Starkville.

¶3.   After everyone arrived at his apartment, Dudley went to sleep while the other men continued to gamble. Murry testified that by about 6 a.m., he had lost all the money he had with him. Ward's friend, Jernagin, testified that Murry claimed he had more cash at his Columbus residence and that he could use the cash to cover his losses if Ward and Jernagin would allow him to continue gambling with them. Informing the others that he did not

2

"gambl[e] on air," Jernagin left Dudley's apartment and went home. Murry and Ward continued to gamble until about 8:30 a.m. Murry testified that he had probably lost a total of $1,100 to Ward but only still owed Ward about $600 or $700 when they finished gambling. By contrast, Monroe and Morris both testified that to the best of their knowledge, Murry still owed Ward about $1,300 when the gambling finished. Regardless of the exact amount Murry still owed Ward, Murry promised to pay Ward the remaining balance if Ward accompanied Murry to his Columbus residence.

¶4. On the drive back to Columbus, Murry stopped at a gas station, and he and Ward went inside. Video footage from the gas station's surveillance system showed that Murry wore a black shirt with a white logo while Ward wore a white shirt with a logo, a black belt, blue jeans, and red and white tennis shoes. Monroe and Morris also rode back to Columbus in Murry's vehicle, and later they would both testify that they did not observe any blood or bullet holes while riding in Murry's vehicle. Although Monroe and Morris fell asleep on the way to Columbus, they stated that as far as they knew, nothing occurred during the drive that would have resulted in Ward's blood or bullet holes later being found inside the vehicle.

¶5. Monroe and Morris both awoke as Murry's vehicle neared Columbus. Upon reaching Columbus, Murry first stopped at Monroe's residence. After Monroe exited the vehicle, Morris remained in the back seat while Ward moved from the back of the vehicle to the front passenger seat beside Murry. Murry then dropped off Morris. According to Murry, he and Ward proceeded to Murry's residence, where Murry gave Ward the money he owed him.

3

Murry testified that Ward "mentioned something about getting a room," so Murry suggested a hotel. Murry stated that he dropped Ward off in a parking lot behind the Donut Factory in Columbus and that Ward got into a red vehicle driven by an unknown woman.

¶6. Contrary to Murry's testimony, Morris stated that he never heard Ward mention anything about wanting to be dropped off at the Donut Factory to meet a woman in a red vehicle. Instead, Monroe and Morris both testified that they heard Ward say he needed to rent a car. Monroe further testified that Ward did not have his driver's license with him and asked to use Murry's driver's license to rent the car. Morris stated that as far as he knew when he exited Murry's vehicle, Ward planned to collect his money from Murry and then rent a car. Both Monroe and Morris testified that they never saw or heard from Ward again after they exited Murry's vehicle.

¶7. Ward's friends Dudley and Jernagin also testified that they had no knowledge of a female driver in a red vehicle and that Ward had never mentioned any such woman to them. Dudley and Jernagin further testified that Ward did not have his cell phone with him on the evening of July 25, 2018, while they were gambling. Based on Dudley's and Jernagin's testimony, the State questioned Murry on cross-examination about how Ward had arranged to meet the unknown female driver if Ward did not have his cell phone with him. The State asked whether Murry had seen Ward in possession of his cell phone during the drive back to Columbus or whether Murry had seen Ward use his cell phone to call or text the unknown female driver. Murry testified that he did not recall whether Ward had his cell phone with

4

him on the drive to Columbus, and Murry stated that he did not recall Ward using either his own or anyone else's cell phone to arrange to meet the woman in the Donut Factory parking lot.

¶8.     According to Murry, he returned home after dropping Ward off in the Donut Factory's parking lot. Although Murry stated he had made plans to meet with Ward later in the week to continue gambling, Murry testified that he never again saw or heard from Ward. Murry further testified that the following morning, on July 27, 2018, he discovered one of the windows in his vehicle had been broken. Murry stated he had attributed the damage to a woman he had been dating at the time.

¶9.     Murry testified that he called Glass Doctor in Starkville about repairing the broken window. Sandra Gilmore, the office manager at Glass Doctor, testified that Murry had informed her that he would need "[t]he passenger door glass and the passenger quarter glass, which would be the right side of the vehicle" replaced on his Dodge Challenger. After beginning the work on Murry's vehicle, technician Joshua Smith informed Gilmore that there were bullet holes in the vehicle. When Gilmore inspected Murry's vehicle with Smith, she observed "[t]hat there was a bullet hole[,] and the bullet was coming from inside the vehicle to the outside." Smith confirmed during his own testimony that the bullet holes he and Gilmore observed started from inside the vehicle and proceeded toward the outside of the vehicle. Gilmore and Smith further testified that they observed a bullet hole in the vehicle's window trim.

5

¶10. When questioned at trial about the bullet holes inside his vehicle, Murry testified that he had purchased the vehicle used and had not paid attention to the many defects at the time of purchase. Murry further claimed he did not know the source of either the bullet fragments or the blood that law enforcement later found inside his vehicle. After observing the bullet holes in Murry's vehicle, Gilmore reported the finding to the Starkville Police Department. Once police officers documented the bullet holes and released the vehicle for repairs, Smith replaced the broken glass on Murry's vehicle.

¶11. Officer John Compton, who worked with the Columbus Police Department at the time of Ward's death, testified that he received a dispatch call on July 27, 2018, about a missing person. After speaking with Ward's parents, John and Betty Ward, Officer Compton called Murry. Murry told Officer Compton that he had dropped Ward off at the Donut Factory in Columbus and that Ward had gotten into a red car driven by an unknown woman. At the time of their phone conversation, Murry told Officer Compton that he was in Jackson, Mississippi. After his initial inquiries, Officer Compton turned the case over to Investigator Reginald Adams.

¶12. Investigator Adams also spoke to Ward's parents and then contacted Murry. Ward's father John had informed Investigator Adams that Ward's cell phone was still in Starkville. Therefore, when he spoke to Murry, Investigator Adams asked how Ward had been able to communicate with the unknown female driver if he did not have his cell phone. In response, Murry stated that he did not know. Investigator Adams asked whether Murry could come to

6

the Columbus Police Department for further questioning, but he recalled Murry stating that he was in Southaven, Mississippi, for a family reunion.

¶13.    Based on Murry's statement to both officers that he had dropped off Ward at a specific location, Investigator Adams went to the only Donut Factory in Columbus and reviewed several hours of video footage from the time period in question.[1] He testified that he never observed either a red car or Murry's white Dodge Challenger on the video footage. After Investigator Adams began coordinating with the Starkville Police Department, he learned about the glass repair to Murry's vehicle windows and the bullet holes Gilmore had observed and reported. Law enforcement officers obtained a search warrant to determine the location of Murry's vehicle through the vehicle's GPS.

¶14.    Because Murry's vehicle had an Arkansas license plate, Mississippi law-enforcement officers contacted the police department in Wynn, Arkansas, where Murry's vehicle was registered, and asked that the Wynn police officers be on the lookout for Murry's Dodge Challenger.   After discovering Murry's vehicle at a residence in Wynn, local law-enforcement officers arrested Murry pursuant to a Mississippi warrant. Investigator Adams and Sergeant Michael Lay from the Starkville Police Department drove to Arkansas and transported Murry back to Columbus.

¶15.    While being transported back to Mississippi, Murry told Investigator Adams and

---

[1] Although Investigator Adams's trial testimony varied about whether he watched the Donut Factory's video footage from July 26, 2018, or July 27, 2018, the video footage admitted into evidence reflected the date of July 26, 2018.

Sergeant Lay that the window on his Dodge Challenger had been broken while he was inside a club in Starkville. At trial, following Murry's testimony that a disgruntled former girlfriend had broken his vehicle window while the vehicle was parked outside his home, the State introduced the audio recording of Murry's prior statement to Investigator Adams and Sergeant Lay to impeach his trial testimony. After playing the audio recording for the jury, the State questioned Murry about the prior explanation he had given for his broken vehicle window. In response, the only explanation Murry provided was that when "you get involved with the police, you . . . will tell them anything, whatever. That wasn't my original statement."

¶16. The same day that Investigator Adams and Sergeant Lay transported Murry back to Columbus, local law-enforcement officers discovered Ward's dead body in Lowndes County (within the jurisdiction of the Lowndes County Sheriff's Office). Sergeant Lay received a phone call that evening and went to the scene. Sergeant Lay testified that he previously had reviewed the gas-station video footage, and he confirmed that the clothing Ward wore in the video footage matched the clothing found on Ward's body at the scene. Because Ward's body was discovered outside the jurisdiction of both the Starkville and Columbus Police Departments, the case and all investigative materials were transferred to Detective Joshua McCain with the Lowndes County Sheriff's Office.

¶17. Consistent with Sergeant Lay's testimony, Detective McCain stated that when found, Ward's body was clothed in a white shirt with a logo, blue jeans, a black belt, and red and

white tennis shoes. Detective McCain also testified that the pocket of Ward's jeans had been pulled out and emptied. Detective McCain observed several pieces of broken glass in the road near Ward's body. Also near Ward's body, Detective McCain observed what appeared to be the window from a passenger door. According to Detective McCain, there appeared to be a bullet hole visible in the passenger-door glass. The final item law enforcement officers discovered near Ward's body was a black Tommy Hilfiger shirt. Murry later admitted during his cross-examination that the black Tommy Hilfiger shirt found at the crime scene appeared to be similar to the one he had worn in the gas station's video footage from July 26, 2018. Murry claimed, however, that he had no knowledge of how the shirt ended up next to Ward's body, and he denied that the shirt was the same one he had worn on the day in question.

¶18. Detective McCain sent the broken glass from the crime scene and samples of broken glass found inside Murry's passenger-side door to the FBI for comparison. While retrieving the glass shards from inside the passenger door, law-enforcement officers also discovered bullet fragments. After requesting help from a contact at the United States Department of Justice (DOJ), Detective McCain and his colleagues obtained mapping information for Murry's cell phone for the estimated time of Ward's death.

¶19. Austin Shepherd, the director of the Columbus Forensic Laboratory, helped process Murry's Dodge Challenger as part of the investigation into Ward's death. The circuit court accepted Shepherd as an expert in crime-scene investigation. During his examination of the

exterior of Murry's vehicle, Shepherd observed a defect in the bottom seal of the passenger-side window as well as a red stain underneath the passenger-side door handle. Upon examining the vehicle's interior, Shepherd observed additional defects in the surface of the passenger-side material and the seal of the passenger-side window. Underneath the front passenger seat, Shepherd observed a small piece of glass and stains that appeared to be consistent with blood. Using an alternate light source, Shepherd discovered additional blood-like stains on the side and backrest of the front passenger seat, on the front passenger-side floorboard, above the rear passenger-side window, and on the sunroof's shade. When Shepherd performed an initial analysis, the stains tested presumptively positive for human blood.

¶20. Inside the trunk of Murry's vehicle, Shepherd found a shirt, a bottle of carpet cleaner, and a bottle of hydrogen peroxide. When subjected to the alternate light source, the shirt appeared to have stains consistent with blood. Shepherd testified that he also found a white residue concentrated on the inside of the passenger-side door and on the floorboard. Shepherd did not test the white residue, however, and therefore could not confirm whether the residue was hydrogen peroxide from the bottle found inside Murry's trunk. Shepherd did confirm, though, that he found no similar white residue or blood-like stains on the driver's side of Murry's vehicle.

¶21. Detective McCain testified that he had sent for further analysis the shirt collected from the trunk of Murry's vehicle and two of the samples of presumptive human blood collected

10

from the passenger side of Murry's vehicle. For comparisons to these items, Detective McCain sent DNA swabs collected from Ward's parents. George Schiro, the laboratory director at Scales Biological Laboratory, stated that his laboratory analyzed and compared the items. The circuit court accepted Schiro as an expert in DNA analysis. Schiro testified that the shirt and vehicle samples tested positive for human blood from a single individual. Schiro further stated that testing revealed a 99.9 percent probability of paternity between Ward's father, John, and the single source of the DNA collected from the shirt and vehicle samples. In other words, Schiro explained, a 99.9 percent probability existed that John was the biological father of the person whose blood was collected from the items inside Murry's vehicle.

¶22.    Ian Saginor with the FBI testified as an expert in forensic geology. Saginor explained that as part of his duties, he examines geologically derived materials such as glass. Saginor testified that not all glass is the same and that different pieces of glass can be compared to determine if they "share a common origin" with each other. Saginor examined and compared the side window found at the crime scene near Ward's body and the glass fragments recovered from the interior of Murry's passenger-side door. Saginor randomly selected ten of the twenty-four glass fragments collected from the interior of Murry's passenger-side door to compare to the passenger-side window. Saginor's tests showed that the measured properties of eight of the randomly selected glass fragments were indistinguishable from those of the passenger-side window recovered from the crime scene. As a result, Saginor

11

concluded those eight glass fragments "either came from the same broken glass source" as the passenger-side window or came from "another glass source that's indistinguishable [in] all the measured physical, optical[,] and elemental properties." Saginor testified that the ninth randomly selected glass fragment he tested was different from the window recovered at the crime scene and that the tenth glass fragment was not tested for elemental composition but shared the same physical properties and refractive index as the window.

¶23.    The State also called Paul Rowlett to testify about Murry's movements from July 25 to 27, 2018, based on Murry's cell phone data. At the time of Ward's murder, Rowlett worked for the DOJ, and without any objection from the defense, the circuit court accepted Rowlett as an expert in intelligence analysis. Because Monroe and Murry testified they had been together until Murry dropped Monroe off at his residence the morning of July 26, 2018, Rowlett examined both Murry's and Monroe's cell phone records. Rowlett explained that he used the information to track and compare the men's movements during the time in question. Rowlett stated he put the cell-site data he received into a federal database that maps out the general location of a cell phone at the time of an outgoing or incoming call. Based on the data, Rowlett found nothing to contradict Monroe's statement regarding his movements during the time in question. As Monroe testified, the data showed that he and Murry traveled together from Starkville to Columbus on the morning of July 26, 2018. Monroe's cell phone data then showed that from about 9 a.m. to 1 p.m. on July 26, 2018, Monroe remained near his residence in Columbus. Rowlett further testified, however, that

there was nothing in Murry's cell-site data to corroborate his testimony that he drove Ward to the Donut Factory after dropping off Monroe. Instead, at about 9:30 a.m., Murry's cell phone data indicated he was east of Columbus in the opposite direction from the Donut Factory. At 10:43 a.m., Murry's cell phone data placed him in a sector that covered the area where law enforcement discovered Ward's body. For the next hour and a half, Murry did not make or receive a phone call while in the sector where law enforcement found Ward's body. After this period of cellular inactivity, Murry made phone calls at 12:08 p.m. and 12:10 p.m. to Monroe and Morris, respectively. These two phone calls placed Murry back near his residence in Columbus.

¶24. Chief Medical Examiner Dr. Mark LeVaughn testified by video deposition about the autopsy he performed on Ward's body. Dr. LeVaughn confirmed that Ward's body was severely decomposed by the time law enforcement discovered it, and he stated the level of decomposition was consistent with Ward dying sometime around July 26, 2018. Dr. LeVaughn observed a significant amount of trauma to Ward's skull, mainly on the right side. Further examination showed the trauma was caused by a gunshot wound above Ward's right eye. Other than the gunshot wound to the right forehead area of the skull, Dr. LeVaughn was unable to identify any other traumatic injuries to Ward's body that would have contributed to his death. Based on his findings, Dr. LeVaughn concluded that Ward was murdered by a gunshot wound to his head.

¶25. Following its deliberations, the jury found Murry guilty of first-degree murder, and

13

the circuit court sentenced Murry to life imprisonment in MDOC's custody. Murry filed an unsuccessful motion for judgment notwithstanding the verdict or, alternatively, a new trial. Aggrieved, Murry appeals.

## DISCUSSION

### I. Prosecutorial Misconduct

¶26. On appeal, Murry asserts that improper comments made during his cross-examination and the State's closing argument constituted prosecutorial misconduct. Murry acknowledges that his failure to contemporaneously object to the State's comments and arguments at trial procedurally bars the issue on appeal. *See Brisco v. State*, 295 So. 3d 498, 509 (¶23) (Miss. Ct. App. 2019) ("The failure to object at trial waives any assignment of error on appeal absent plain error."). Due to his failure to object at trial, Murry asks this Court to review the issue for plain error. We will only find plain error "when a defendant's substantive or fundamental rights are affected." *Id.* For plain error to occur, there must be a trial error that "results in a manifest miscarriage of justice." *Wilson v. State*, 276 So. 3d 1241, 1253 (¶27) (Miss. Ct. App. 2018) (quoting *Beasley v. State*, 136 So. 3d 393, 399-400 (¶20) (Miss. 2014)).

¶27. Attorneys customarily receive wide latitude in making their closing arguments. *Miskell v. State*, 270 So. 3d 23, 33 (¶35) (Miss. Ct. App. 2018). "Any alleged improper prosecutorial comments must be considered in the context of the circumstances of the case." *Id.* Relevant to Murry's claims on appeal, our caselaw holds the following:

14

Even when the State makes improper comments, we have recognized that not every improper comment rises to the level of reversible error. *See Randall v. State*, 806 So. 2d 185, 212 (¶67) (Miss. 2001) ("Although error, the question of whether the comment constitutes reversible error is a separate and distinct question."). Reversal is required only when "the natural and probable effect of the improper argument of the prosecuting attorney is to create such an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Id.*

*Hearns v. State*, 313 So. 3d 533, 537 (¶12) (Miss. Ct. App. 2021).

### a. Murry's Cross-Examination

¶28. In beginning Murry's cross-examination, the district attorney stated, "I'm going to give you a chance to get right with God. I'm going to ask you again. I want you to look at the Ward family[,] and I want you to admit to them, tell them the truth, you killed their son[,] and ask for their forgiveness." In response to this line of cross-examination, Murry repeated his denial that he had not killed Ward. On appeal, Murry argues the district attorney erred by "invok[ing] religion" and "demanding [that] Murry confess."

¶29. In *Turner v. State*, 573 So. 2d 657, 671 (Miss. 1990), the Mississippi Supreme Court addressed a similar assertion that the district attorney improperly invoked religion during the defendant's questioning and in closing arguments. Like Murry, Turner was charged with murder, and on cross-examination, the district attorney asked, "Did the thought of [the victim] having a Christian burial ever cross your mind?" *Id.* The circuit court overruled the defense's objection to the question, and on appeal, the supreme court held there was no error. *Id.* In so holding, the *Turner* court distinguished the matter from *Brewer v. Williams*, 430 U.S. 387 (1977), where the United States Supreme Court condemned a police officer's

15

Christian burial speech made to a custodial pretrial suspect to entice the suspect to confess and provide information regarding the location of the victim's body. *Brewer*, 430 U.S. at 399-401. Moreover, the *Turner* court recognized that besides the State's use of religion at trial, Turner's own attorneys "made numerous references to scriptures in the Bible and quoted them to the jury in an attempt to obtain mercy for [Turner]." *Turner*, 573 So. 2d at 671.

¶30. Here, even though Murry did not "invoke religion" during his trial like the defense did in *Turner*, we conclude that the district attorney's words to Murry were more similar to the circumstances presented in *Turner* than in *Brewer*. As in *Turner*, Murry asserts that the district attorney improperly injected religion into his cross-examination. Unlike in *Turner*, however, Murry raised no contemporaneous trial objection to the district attorney's remark, and on appeal, he asserts prosecutorial impropriety without providing any further analysis or relevant authority to support his claim. As our caselaw firmly establishes, the "[f]ailure to cite relevant authority obviates the appellate court's obligation to review such issues." *Cork v. State*, 329 So. 3d 1183, 1190 (¶21) (Miss. 2021) (quoting *Arrington v. State*, 267 So. 3d 753, 756 (¶9) (Miss. 2019)). Further, as noted, Murry failed to object to the district attorney's question at trial, and upon review, we cannot find that "the natural and probable effect" of the district attorney's isolated cross-examination remark was "to create such an unjust prejudice against [Murry so] as to result in a decision influenced by the prejudice so created." *Hearns*, 313 So. 3d at 537 (¶12) (quoting *Randall*, 806 So. 2d at 212 (¶67)). Based

16

on these circumstances, we find that no plain error resulted that would require the reversal of Murry's conviction.

### b. The State's Closing Argument

¶31. Murry also alleges that the district attorney committed prosecutorial misconduct during the State's closing argument by improperly shifting the burden of proof to Murry and by making a send-a-message argument. As with the previous alleged error, Murry failed to raise any objections to the remarks at trial, so we review for plain error.

### i. Burden of Proof

¶32. During closing arguments, the district attorney stated the following:

[Murry's version of events is] not possible. It's too much. It's too much with no explanation. Zero. He gave you nothing. It has to be to the exclusion of every reasonable hypothesis consistent with innocence. He gave you no reasonable scenario for any of that to happen to prove he's innocent. Zero. The only thing he gave you is, ["]I don't know. It's a coincidence.["]

He also fell for my trap when I crossed him. I do this every time. I cross the Defendant—I do it quite often as [district attorney]. Every time the guilty people—that's the only people I try—they always get in an argument with me. It's temptation because they know they did it, they get in an argument with me.

¶33. With regard to Murry's contention that the district attorney's remarks improperly shifted the burden of proof to the defense, we note that the circuit court instructed the jury as follows prior to closing arguments:

A defendant is presumed innocent. This presumption of innocence requires that the State must prove that the defendant is guilty beyond a reasonable doubt and to the exclusion of any reasonable explanation of the defendant's innocence. This presumption of innocence stays with the defendant throughout the trial or until the evidence convinces the jury of the defendant's

17

guilt beyond a reasonable doubt and to the exclusion of any reasonable explanation of the defendant's innocence. The defendant is not required to prove his innocence.

¶34. In addition to properly instructing the jury as to the presumption of Murry's innocence and the State's burden of proof, the circuit court explained that the attorneys' arguments, statements, and remarks did not amount to evidence and were only intended to help the jury understand the actual evidence and apply the law. Moreover, the circuit court specifically instructed the jury to disregard any argument, statement, or remark that lacked a basis in the evidence presented at trial. A strong presumption exists that jurors follow the instructions the trial court gives to them. *Lyons v. State*, 237 So. 3d 763, 772 (¶36) (Miss. Ct. App. 2017). And after reviewing the record, we find that the circuit court properly instructed the jury as to the presumption of Murry's innocence and the State's burden of proof.

¶35. We further find that the circuit court's proper instruction to the jury cured any subsequent erroneous remark the district attorney made about these matters during closing arguments. We find this point especially pertinent in light of the district attorney's comment that he only tries guilty people. Mississippi Rule of Professional Conduct 3.4(e) specifically prohibits attorneys from "stat[ing] a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant[,] or *the guilt or innocence of an accused* . . . ." (Emphasis added). As we have previously explained, it is never proper for an attorney to "assume the role of the jury and exchange his opinions as to guilt or innocence as currency in the deliberative process of the jury." *Abram v. State*, 309 So. 3d 579, 586

18

(¶20) (Miss. Ct. App. 2020). Although improper, we conclude that in light of the circuit court's proper instruction to the jury, the district attorney's single remark about only trying cases against guilty people failed "to create such an unjust prejudice against [Murry so] as to result in a decision influenced by the prejudice so created." *Hearns*, 313 So. 3d at 537 (¶12) (quoting *Randall*, 806 So. 2d at 212 (¶67)). We therefore find no reversible error.

### ii. Send-a-Message Argument

¶36. Murry also asserts that the circuit court plainly erred by allowing the district attorney to employ a send-a-message argument during the State's closing argument. In relevant part, the district attorney stated the following:

> Because [the Wards] trusted the process, we got to this point where you all [(the jury)] can do what you gotta do because we did what we had to do.
>
> . . . .
>
> In Columbus, Mississippi, we hold people accountable for that [(murder)]. You don't get away with that in Columbus. That's why you [(the jury)] gotta do your duty. You gotta find the Defendant guilty of murder. You gotta give [Ward's] family justice. You gotta uphold the law[,] and you gotta make sure . . . everybody knows [that] when the evidence is there in Columbus, Mississippi, when the law enforcement [officers] do[] their job[s], when the prosecutor presents the evidence in Columbus, Mississippi, we find people guilty of murder.

¶37. Send-a-message arguments "encourage[] juries to use their verdict to send-a-message to the public or to other potential criminals, instead of rendering a verdict based solely on the evidence introduced at the trial of that case." *Dille v. State*, 334 So. 3d 1162, 1196 (¶106) (Miss. Ct. App. 2021) (quoting *Coleman v. State*, 289 So. 3d 1221, 1225 (¶11) (Miss. Ct.

19

App. 2020)). We have held that "only when counsel departs entirely from the evidence, makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence" should a "trial judge . . . intervene to prevent unfair argument . . . ." *Id.* (internal quotation mark omitted) (quoting *Coleman*, 289 So. 3d at 1224 (¶9)).

¶38.    In considering Murry's allegations, we use "[t]wo threshold questions . . . to determine whether a send-a-message argument constitutes reversible error." *Miskell*, 270 So. 3d at 35 (¶43) (quoting *Jackson v. State*, 174 So. 3d 232, 238 (¶17) (Miss. 2015)). We "first look[] at whether the argument is procedurally barred because defense counsel failed to object to the statement at trial." *Id.* As previously discussed, Murry made no contemporaneous objection to the district attorney's closing-argument remarks. "[E]ven in the absence of a contemporaneous objection" by the defendant, however, "we will review on appeal a claim that a prosecutor made an improper send-a-message argument if the argument is so inflammatory that the trial judge should have objected on his own motion." *Id.* (quoting *Jackson*, 174 So. 3d at 238 (¶17)). We next "consider[] whether the defense counsel provoked the prosecution to make the challenged statement. After considering the two threshold questions, the Court . . . must determine (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused's rights." *Id.*

¶39.    Our review of the record reveals no evidence that Murry's attorney in any way provoked the district attorney's alleged send-a-message or do-your-duty argument. As a

result, we next look at the specific remarks made by the district attorney and determine whether they were, in fact, improper. *See id.* In so doing, we conclude that the district attorney's collective statements to the jury were impermissible and closely akin to the arguments declared improper in both *United States v. Young*, 470 U.S. 1, 18 (1985), and *Jackson*. In those cases, the United States Supreme Court and the Mississippi Supreme Court recognized that "encourag[ing] the jury to 'do its job'" amounts to error, and such "prosecutorial pressure [does] not belong in the administration of criminal justice." *Jackson*, 174 So. 3d at 237 (¶15) (quoting *Young*, 470 U.S. at 18). The courts further noted that "[u]rging the jury to finish what the prosecution started was improper . . . ." *Id.* at 238 (¶18).

¶40. Without question, the comments at issue in the case before us run afoul of the clear direction given by the highest appellate courts in our state and nation. Despite the impropriety of the district attorney's statements, however, "we must [still] determine 'whether the remark[s] prejudicially affected the accused's rights.'" *Miskell*, 270 So. 3d at 35 (¶44) (quoting *Jackson*, 174 So. 3d at 238 (¶17)); *see also Ford v. State*, 333 So. 3d 896, 919-20 (¶¶70-71) (Miss. Ct. App. 2022) ("Even if a prosecutor has made an impermissible comment, there must be a showing of prejudice to warrant reversal." (internal quotation marks omitted)). To hold any error harmless, "it must be clear beyond a reasonable doubt that, absent the prosecutor's inappropriate comments, the jury would have found the defendant guilty." *Miskell*, 270 So. 3d at 35 (¶44) (quoting *Brown v. State*, 986 So. 2d 270, 276 (¶16) (Miss. 2008)).

21

¶41. Here, the State presented more than substantial evidence over the course of the trial to establish Murry's guilt. We therefore find "it is clear beyond a reasonable doubt that, absent the prosecutor's comment[s] . . . , the jury would have found [Murry] guilty" of Ward's murder. *Id.* As a result, "it cannot be said that the natural and probable effect of the prosecutor['s] comment[s] was to create unjust prejudice against [Murry] which resulted in a verdict influenced by this prejudice." *Jackson*, 174 So. 3d at 238 (¶18). Accordingly, we decline to find that the district attorney's improper closing-argument remarks amounted to reversible error.

## II. Admission of Photographs

¶42. Murry next argues that the circuit court erred by allowing the State to admit into evidence multiple photographs of Ward's decomposing body. According to Murry, the photographs were unnecessary, were extremely gruesome, failed to resolve any fact issue in the case, and were intended to arouse the jury's passion and prejudice. Because he failed to object to the photographs at trial, Murry's arguments on appeal are procedurally barred. *See Wilson*, 276 So. 3d at 1253 (¶25) (holding that a defendant's failure to object to the admission of photographs at trial waives the matter on appeal).

¶43. Notwithstanding the procedural bar, we find no error in the admission of the photographs at issue. We ordinarily review the trial court's admission of photographs for abuse of discretion. *Id.* at (¶26). As stated, though, Murry failed to object to the subject photographs' admission into evidence at trial. We therefore review his argument for plain

22

error. *See id.* at (¶27) ("The plain-error doctrine is implicated when an error occurs at trial which affects substantial rights and results in a manifest miscarriage of justice." (quoting *Beasley*, 136 So. 3d at 399-400 (¶20)).

¶44.    The photographs to which Murry now objects on appeal provided relevant evidence that clarified witnesses' testimony regarding where Ward's body was discovered, how his identity was confirmed, and how his date of death and cause of death were determined. For instance, following the admission of multiple crime-scene and autopsy photographs, Dr. LeVaughn testified in depth as to how the state of a body's decomposition enables the determination of when the murder occurred. In this case, where the final sequence of interactions between Murry and Ward were vigorously contested, the State offered the subject photographs and Dr. LeVaughn's testimony to corroborate the timeline of events that other witnesses provided regarding Ward's last contact with Murry on July 26, 2018. Further, Dr. LeVaughn's testimony and the photographs admitted during his direct examination assisted the State's presentation of information regarding the path of the gunshot through Ward's skull, the injury Ward sustained from the gunshot, and the identification of his body. These issues also proved to be the defense's focus during Dr. LeVaughn's cross-examination, which further demonstrates the relevance and probative value of the photographs.

¶45.    Our caselaw recognizes that "[e]ven if [a] photograph is gruesome, grisly, unpleasant, or even inflammatory, it still may be admitted so long as it has probative value and its

23

introduction serves a meaningful evidentiary purpose." *Mosley v. State*, 307 So. 3d 1261, 1268 (¶26) (Miss. Ct. App. 2020) (quoting *Beasley*, 136 So. 3d at 400 (¶21)). Mississippi appellate courts have found that a meaningful evidentiary purpose exists where the subject photograph "describes the circumstances of the killing, its location, or the cause of death[,] or supplements a witness's testimony." *Id.* at 1268-69 (¶26). As this Court has recognized, "the bar is low for admission, and some probative value is the only requirement needed . . . to support a trial judge's decision to admit photographs into evidence." *Id.* at 1269 (¶27) (citations and internal quotation mark omitted). Because the photographs at issue here possessed probative value and several meaningful evidentiary purposes, we find that their admission neither resulted in a manifest miscarriage of justice nor constituted plain error.

### III. Ineffective Assistance of Counsel

¶46. In his final assignment of error, Murry contends his trial attorney rendered ineffective assistance of counsel by "failing to object to any of the gruesome photographs of Ward's body[,] failing to object to the State's improper closing argument[,]" and "fail[ing] to adequately advise [Murry] about the potential pitfalls of testifying on his own behalf."

¶47. "Ineffective-assistance-of-counsel claims generally are reserved for post-conviction relief." *Ford*, 333 So. 3d at 912 (¶41). We address ineffective-assistance claims on direct appeal, however, if "[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the finding of facts by a trial judge able to consider the demeanor of the witnesses, etc.,

are not needed." *Id.* (quoting *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020)). We also review ineffective-assistance claims on direct appeal where "the record affirmatively shows the claims [lack] merit." *Id.* at 912-13 (quoting *Ross*, 288 So. 3d at 324 (¶29)). Here, the record does not affirmatively show either ineffective assistance or that Murry's claims lack merit. In addition, the State did not stipulate to the adequacy of the record for this Court to review Murry's claims on the matter. We therefore decline to further address Murry's ineffective-assistance-of-counsel argument and recognize that the claim is preserved for post-conviction relief. *See Lyons*, 237 So. 3d at 774 (¶43) ("The Mississippi Supreme Court has stated that, where the record cannot support an ineffective[-]assistance[-]of[-]counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief." (quoting *Wilcher v. State*, 863 So. 2d 719, 761 (¶162) (Miss. 2003))).

## CONCLUSION

¶48. Because we find no reversible error, we affirm Murry's conviction and sentence for first-degree murder.

¶49. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.**